# 18-2990(L)

**18-3710(CON), 18-3712(CON), 18-3715(CON), 18-3850(CON), 19-1272(CON)**

*To Be Argued By:*
ALEXANDRA A.E. SHAPIRO

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆●◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

PETER GALBRAITH KELLY, JR., MICHAEL LAIPPLE, KEVIN SCHULER,

*Defendants,*

JOSEPH PERCOCO, STEVEN AIELLO, JOSEPH GERARDI,
LOUIS CIMINELLI, ALAIN KALOYEROS, AKA DR. K,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT STEVEN AIELLO

ALEXANDRA A.E. SHAPIRO
DANIEL J. O'NEILL
FABIEN M. THAYAMBALLI
SHAPIRO ARATO BACH LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

*Attorneys for Defendant-Appellant
Steven Aiello*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iv

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ...........................................................3

ISSUES PRESENTED.............................................................................3

STATEMENT OF THE CASE...................................................................4

    A.   Background...................................................................................5

    B.   The Percoco Trial .......................................................................6

          1.     The Alleged Public-Bribery Scheme ................................6

          2.     District Court Rulings And Jury Instructions ................12

               a.    Public Official Requirement....................................12

               b.    "As Opportunities Arise" ........................................15

          3.     Rule 29 Motions And Verdict........................................16

    C.   The FSMC Trial .......................................................................17

    D.   Sentencing ...............................................................................17

STANDARDS OF REVIEW ...................................................................17

SUMMARY OF ARGUMENT ................................................................18

ARGUMENT .......................................................................................21

I.    THE JURY INSTRUCTIONS CONSTRUCTIVELY AMENDED THE HONEST-SERVICES COUNT ...............................................................21

    A.   Constructive Amendments Are Unconstitutional ....................21

B. The Object Of A Conspiracy May Not Be Constructively Amended ...................................................................................23

C. The Private-Citizen Instruction Constructively Amended The Indictment .................................................................................24

D. At A Minimum, There Was A Prejudicial Variance ...............................26

II. THE HONEST-SERVICES CONVICTION IS LEGALLY INVALID AND FACTUALLY INSUFFICIENT ............................................................27

A. The Private-Citizen Theory Is Legally Invalid .......................................28

1. *McDonnell* Requires At Least One *Quid Pro Quo* Participant Who Is A Public Official ...............................................28

2. The Private-Citizen Theory Raises Serious Constitutional Concerns...................................................................32

3. *McDonnell*, *Skilling*, And *McNally* Supersede *Margiotta*.............37

B. The Evidence Was Insufficient Under Both The Public-Official And Private-Citizen Theories ...................................................39

C. At A Minimum, Retrial Is Required.........................................................44

III. *MCDONNELL* FORECLOSED THE "AS OPPORTUNITIES ARISE" INSTRUCTION ............................................................................45

A. The Instruction Contravened *McDonnell* ................................................47

B. *McDonnell* Makes *Sun-Diamond* Applicable To Honest-Services Bribery..........................................................................49

C. The Error Was Not Harmless ..................................................................50

IV. AIELLO IS ENTITLED TO ACQUITTAL ON THE WIRE-FRAUD CHARGES ...........................................................................................51

A. Background...............................................................................................52

1. FSMC RFPs .................................................................................52

2. Government Theory ...................................................54

3. Aiello's Perspective ................................................54

4. Alleged "Tailoring" ................................................57

5. RFP Process ..........................................................59

6. Rulings Below ......................................................61

B. FSMC Received The Benefit Of Its Bargain ...........................62

C. There Was No Evidence That FSMC Lost A Better Deal ......................64

D. There Was No Evidence That Aiello Harbored Fraudulent Intent ..............................................................68

E. The Right-To-Control Theory Is Invalid ...................................70

V. THE WIRE-FRAUD INSTRUCTIONS WERE ERRONEOUS, INCOMPLETE, AND CONFUSING ...........................................72

A. The Instructions Improperly Permitted Conviction Even If FSMC Was Not Deprived Of The Benefit Of Its Bargain Or A Better Deal ......74

B. The Instructions Were Confusing And Misleading ..................................76

VI. AIELLO WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE TO THE WIRE-FRAUD CHARGES ....................80

A. The Evidence Was Admissible To Show Lack Of Harm ........................81

B. The Evidence Was Admissible To Rebut Scienter ..................................83

CONCLUSION ........................................................85

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AG Capital Funding Partners, L.P. v. State St. Bank & Tr. Co.*,
   11 N.Y.3d 146 (2008) ............................................................................38

*Citizens United v. FEC*,
   558 U.S. 310 (2010) ............................................................................32

*City of Chicago v. Morales*,
   527 U.S. 41 (1999) ..............................................................................33

*Cleveland v. United States*,
   531 U.S. 12 (2000) ................................................... 33, 70, 71, 72, 77

*Coates v. City of Cincinnati*,
   402 U.S. 611 (1971) ............................................................................33

*Cramp v. Bd. of Pub. Instruction of Orange Cnty.*,
   368 U.S. 278 (1961) ............................................................................33

*Crane v. Kentucky*,
   476 U.S. 683 (1986) ............................................................................83

*Dixson v. United States*,
   465 U.S. 482 (1984) ............................................................................29

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961) ............................................................................32

*Ex parte Bain*,
   121 U.S. 1 (1887) ...............................................................................26

*Green Party of Conn. v. Garfield*,
   616 F.3d 189 (2d Cir. 2010) ...............................................................32

*Hawkins v. Costello*,
   460 F.3d 238 (2d Cir. 2006) ...............................................................83

iv

*Hudson v. New York City*,
  271 F.3d 62 (2d Cir. 2001) ..................................................................79

*Johnson v. United States*,
  135 S. Ct. 2551 (2015) .......................................................................33

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
  753 F.3d 395 (2d Cir. 2014) ..............................................................37

*McConnell v. FEC*,
  540 U.S. 93 (2003) ...........................................................................32

*McDonnell v. United States*,
  136 S. Ct. 2355 (2016) ................................................................ *passim*

*McNally v. United States*,
  483 U.S. 350 (1987) ................................................ 34, 36, 37, 41, 70

*Neder v. United States*,
  527 U.S. 1 (1999) ........................................................................ 45, 69

*Ocasio v. United States*,
  136 S. Ct. 1423 (2016) ......................................................................29

*Russell v. United States*,
  369 U.S. 749 (1962) ..........................................................................26

*Sandstrom v. Montana*,
  442 U.S. 510 (1979) ..........................................................................82

*SEC v. DiBella*,
  587 F.3d 553 (2d Cir. 2009) ..............................................................38

*Sekhar v. United States*,
  570 U.S. 729 (2013) ............................................................... 71, 72, 79

*Shushan v. United States*,
  117 F.2d 110 (5th Cir. 1941) .............................................................39

*Skilling v. United States*,
  561 U.S. 358 (2010) ..................................................................... *passim*

*Smith v. United States*,
　　360 U.S. 1 (1959) ................................................22

*Sorich v. United States*,
　　555 U.S. 1204 (2009) ..........................................36

*Stirone v. United States*,
　　361 U.S. 212 (1960) ...................................... 22, 27

*Taylor v. Illinois*,
　　484 U.S. 400 (1988) ............................................83

*Union of Needletrades, Indus. & Textile Employees,*
　　*AFL-CIO, CLC v. U.S. I.N.S.*,
　　336 F.3d 200 (2d Cir. 2003) ................................37

*United States v. Al Kassar*,
　　660 F.3d 108 (2d Cir. 2011) ...............................83

*United States v. Allen*,
　　127 F.3d 260 (2d Cir. 1997) ......................... 75, 78

*United States v. Al-Moayad*,
　　545 F.3d 139 (2d Cir. 2008) ...............................84

*United States v. Bahel*,
　　662 F.3d 610 (2d Cir. 2011) ...............................49

*United States v. Binday*,
　　804 F.3d 558 (2d Cir. 2015) ..................... 62, 63, 65, 81

*United States v. Boyland*,
　　862 F.3d 279 (2d Cir. 2017) ......................... 28, 50

*United States v. Bruchhausen*,
　　977 F.2d 464 (9th Cir. 1992) ...............................70

*United States v. Brumley*,
　　116 F.3d 728 (5th Cir. 1997) ...............................38

vi

*United States v. Bruno*,
661 F.3d 733 (2d Cir. 2011) ................................................................28

*United States v. Cain*,
671 F.3d 271 (2d Cir. 2012) ................................................................76

*United States v. Caronia*,
703 F.3d 149 (2d Cir. 2012) ................................................................18

*United States v. Cassese*,
428 F.3d 92 (2d Cir. 2005) ..................................................................39

*United States v. Chestman*,
947 F.2d 551 (2d Cir. 1991) ......................................................... 37, 38

*United States v. Christmann*,
298 F.2d 651 (2d Cir. 1962) ................................................................74

*United States v. Coplan*,
703 F.3d 46 (2d Cir. 2012) ..................................................................67

*United States v. D'Amato*,
39 F.3d 1249 (2d Cir. 1994) ..................................................... 52, 67, 68

*United States v. Diaz*,
878 F.2d 608 (2d Cir. 1989) ................................................................84

*United States v. Dove*,
916 F.2d 41 (2d Cir. 1990) ........................................................... 74, 78

*United States v. Finazzo*,
850 F.3d 94 (2d Cir. 2017) .......................................................... *passim*

*United States v. Forrester*,
60 F.3d 52 (2d Cir. 1995) ....................................................................83

*United States v. Gallerani*,
68 F.3d 611 (2d Cir. 1995) ..................................................................23

*United States v. Ganim*,
510 F.3d 134 (2d Cir. 2007) ....................................... 15, 46, 49, 50

*United States v. Ganji,*
  880 F.3d 760 (5th Cir. 2018) ...............................................69

*United States v. Gayle,*
  342 F.3d 89 (2d Cir. 2003) ..................................................17

*United States v. Gill,*
  748 F.3d 491 (2d Cir. 2014) ................................................37

*United States v. Gonzalez,*
  686 F.3d 122 (2d Cir. 2012) ................................................21

*United States v. Guadagna,*
  183 F.3d 122 (2d Cir. 1999) ........................................ 69, 70

*United States v. Haischer,*
  780 F.3d 1277 (9th Cir. 2015) ............................................82

*United States v. Halloran,*
  821 F.3d 321 (2d Cir. 2016) ................................................37

*United States v. Harvey,*
  547 F.2d 720 (2d Cir. 1976) ................................................82

*United States v. Hassan,*
  578 F.3d 108 (2d Cir. 2008) ........................................ 23, 24

*United States v. Hastings,*
  918 F.2d 369 (2d Cir. 1990) ................................................76

*United States v. Heimann,*
  705 F.2d 662 (2d Cir. 1983) ................................................84

*United States v. Holzer,*
  840 F.2d 1343 (7th Cir. 1988) ............................................38

*United States v. Jain,*
  93 F.3d 436 (8th Cir. 1996) ................................................39

*United States v. Kopstein,*
  759 F.3d 168 (2d Cir. 2014) .............................. 74, 78, 79

*United States v. Lim*,
   897 F.3d 673 (5th Cir. 2018) ................................................................18

*United States v. Litvak*,
   808 F.3d 160 (2d Cir. 2015) ................................................ 69, 84, 85

*United States v. Margiotta*,
   688 F.2d 108 (2d Cir. 1982) ........................................................ *passim*

*United States v. McClain*,
   934 F.2d 822 (7th Cir. 1991) ................................................ 33, 35, 44

*United States v. McFall*,
   558 F.3d 951 (9th Cir. 2009) ................................................................33

*United States v. Milstein*,
   401 F.3d 53 (2d Cir. 2005) ........................................................ 22, 23

*United States v. Mittelstaedt*,
   31 F.3d 1208 (2d Cir. 1994) ................................................ 52, 64, 65

*United States v. Mollica*,
   849 F.2d 723 (2d Cir. 1988) ................................................ 23, 24, 26

*United States v. Murphy*,
   323 F.3d 102 (3d Cir. 2003) ........................................................ 35, 38

*United States v. Novak*,
   443 F.3d 150 (2d Cir. 2006) ................................................ 18, 62, 64

*United States v. Pagano*,
   224 F.2d 682 (2d Cir. 1955) ................................................................74

*United States v. Pauling*,
   No. 17-2539-CR, ---F.3d---, 2019 WL 2220129 (2d Cir. May 23, 2019) ...........67

*United States v. Pierce*,
   224 F.3d 158 (2d Cir. 2000) ........................................................ 51, 52

*United States v. Prawl*,
   168 F.3d 622 (2d Cir. 1999) ................................................................75

*United States v. Regent Office Supply Co.*,
    421 F.2d 1174 (2d Cir. 1970) ................................................... 63, 65, 77

*United States v. Roshko*,
    969 F.2d 1 (2d Cir. 1992) ...................................................... 23, 24, 25

*United States v. Rossomando*,
    144 F.3d 197 (2d Cir. 1998) ....................................................... 77, 79

*United States v. Sadler*,
    750 F.3d 585 (6th Cir. 2014) ...........................................................70

*United States v. Sawyer*,
    85 F.3d 713 (1st Cir. 1996) .............................................................43

*United States v. Scully*,
    877 F.3d 464 (2d Cir. 2017) ............................................................84

*United States v. Shellef*,
    507 F.3d 82 (2d Cir. 2007) ........................................................ 63, 64

*United States v. Silvano*,
    812 F.2d 754 (1st Cir. 1987) ...........................................................39

*United States v. Silver*,
    864 F.3d 102 (2d Cir. 2017) ...................................... 18, 28, 45, 50, 80

*United States v. Skelos*,
    707 F. App'x 733 (2d Cir. 2017) ............................................ 28, 48, 50

*United States v. Starr*,
    816 F.2d 94 (2d Cir. 1987) ........................................ 52, 62, 64, 67, 81

*United States v. Stewart*,
    907 F.3d 677 (2d Cir. 2018) ...................................... 18, 44, 82, 84

*United States v. Sun-Diamond Growers of Cal.*,
    526 U.S. 398 (1999) ................................................... 33, 49, 50

*United States v. Takhalov*,
    827 F.3d 1307 (11th Cir. 2016) ................................................ 63, 79

x

*United States v. Thomas*,
  274 F.3d 655 (2d Cir. 2001) .................................................................. 22, 23, 27

*United States v. Tomblin*,
  46 F.3d 1369 (5th Cir. 1995) ............................................................................33

*United States v. Torres*,
  604 F.3d 58 (2d Cir. 2010) ........................................................................ 43, 52

*United States v. Tropeano*,
  252 F.3d 653 (2d Cir. 2001) ............................................................................18

*United States v. Walters*,
  997 F.2d 1219 (7th Cir. 1993) .........................................................................71

*United States v. West*,
  829 F.3d 1013 (8th Cir. 2016) .........................................................................18

*United States v. White*,
  692 F.3d 235 (2d Cir. 2012) ............................................................................82

*United States v. Wozniak*,
  126 F.3d 105 (2d Cir. 1997) ........................................................ 22, 23, 24, 26

*United States v. Zingaro*,
  858 F.2d 94 (2d Cir. 1988) ..............................................................................23

*In re VerHoef*,
  888 F.3d 1362 (Fed. Cir. 2018) .......................................................................35

*Williams v. United States*,
  458 U.S. 279 (1982) .........................................................................................33

*Wojchowski v. Daines*,
  498 F.3d 99 (2d Cir. 2007) ..............................................................................37

*Woodward v. United States*,
  905 F.3d 40 (1st Cir. 2018) .............................................................................48

*Zarvela v. Artuz*,
  364 F.3d 415 (2d Cir. 2004) ............................................................................83

**Statutes and Rules**

18 U.S.C. §201 ............................................................... 49, 50

18 U.S.C. §666 ............................................................... 6, 45

18 U.S.C. §1001 ...............................................................6

18 U.S.C. §1341 ...............................................................70

18 U.S.C. §1343 ...............................................................70

18 U.S.C. §1346 ............................................... 34, 36, 38, 50

18 U.S.C. §1349 ............................................................... 6, 24

18 U.S.C. §3231 ...............................................................3

28 U.S.C. §1291 ...............................................................3

Fed. R. App. P. 28 ...............................................................21

Fed. R. Evid. 403 ...............................................................82

## **INTRODUCTION**

Steven Aiello's convictions are based on novel fraud theories that raise serious constitutional concerns about due process, fair notice, and the criminalization of protected expression.  Under the first theory, engaging a *former* public official as a consultant can constitute "honest services" fraud if the person still has influence in government affairs.  Under the second theory, a deceptive scheme can be "money or property" fraud even if the victim was never deprived of money or property or exposed to any proven risk of economic harm.  Both theories are foreclosed by controlling Supreme Court and Second Circuit precedents, and none of Aiello's conduct was criminal.  This Court should confine the honest-services and wire-fraud statutes to the narrow, constitutional boundaries set by the Supreme Court and reverse Aiello's convictions.

Aiello co-owned COR Development, a Syracuse company focused on private-sector real estate projects.  In 2010, COR engaged Todd Howe, a government affairs consultant with connections to Governor Andrew Cuomo, to assist it in connection with public development projects in Syracuse.  The indictment contained two sets of charges arising from Howe's work for COR.  The district court severed them and held two trials.

The first trial involved allegations that, on COR's behalf, Howe paid $35,000 to Joseph Percoco when Percoco worked for Cuomo's administration, in

exchange for Percoco's official acts.  But the evidence at trial showed something quite different:  Percoco was actually retained and paid *after he left government service*, and he provided the requested assistance while still a private citizen.  The jury was instructed that it could convict for honest-services fraud conspiracy based on Percoco's mere relationships with public officials while a private citizen.  That instruction constructively amended the indictment and erroneously invited conviction on a theory foreclosed by Supreme Court precedents, and the evidence did not support the "private citizen" theory anyway.  For these and other reasons, the honest-services conviction should be reversed.

The second trial related to COR's work for Fort Schuyler Management Corporation, a non-profit organization affiliated with a state university.  The contracts for these projects resulted from arms-length negotiations, and there was no evidence that Fort Schuyler received less than it paid for or could have gotten a better deal with another developer.  Thus, there was no proof of any economic harm, or even potential economic harm, as required to establish "money or property" wire fraud.  Instead, the government maintained that COR helped a Fort Schuyler board member "tailor" a request for proposals ("RFP") to favor COR, which supposedly deprived Fort Schuyler of its "right to control" its assets.  But the RFP did not award any contract to the winner or even oblige Fort Schuyler to retain the winner for any project.  Instead, Fort Schuyler used the RFP to identify a

2

"preferred developer" that it might use for future (unspecified) projects. There was no wire-fraud scheme on these undisputed facts. For these and other reasons, the wire-fraud convictions must also be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231 and entered the judgment of conviction on December 11, 2018. (SA101). Aiello filed a notice of appeal on December 12, 2018. (A2630). This Court has jurisdiction under 28 U.S.C. §1291.

## ISSUES PRESENTED

1.  Whether the jury instruction permitting conviction for conspiracy to deprive the public of Percoco's honest services while he was a private citizen constructively amended the indictment.

2.  Whether Supreme Court precedents including *McDonnell v. United States*, 136 S. Ct. 2355 (2016), foreclose conviction on a theory that a private citizen owes a duty of honest services to the public.

3.  Whether there was insufficient evidence of a conspiracy to defraud the public of Percoco's honest services while he was either a public official or a private citizen.

3

4.     Whether it was reversible error to permit the jury to convict based on an abstract, open-ended *quid pro quo*, without having to make the specific "official act" findings that *McDonnell* mandates.

5.     Whether the wire-fraud convictions must be reversed due to insufficient evidence that Fort Schuyler ("FSMC") was deprived of the benefit of its bargain or any potentially better deal, or that Aiello intended to defraud FSMC.

6.     Whether the wire-fraud convictions must be reversed because the "right to control" theory contravenes the statutory text and controlling Supreme Court precedents.

7.     Whether the wire-fraud convictions must be vacated because the "right to control" instructions were prejudicially confusing and incomplete.

8.     Whether the erroneous exclusion of critical defense evidence deprived Aiello of his constitutional right to present a meaningful defense to the wire-fraud charges.

## STATEMENT OF THE CASE

Aiello appeals a judgment of conviction entered by the United States District Court for the Southern District of New York (Caproni, J.) following two jury trials. The relevant rulings are unreported.

4

### A. Background

Aiello co-founded COR, a private real estate developer, with Joseph Gerardi. (A511-12/644-45). In 2010, COR expanded into public projects and retained Todd Howe as its government relations consultant. (A604-05/3865-66). Howe ran a government affairs and lobbying firm. He previously worked for Governor Andrew Cuomo and his father, former Governor Mario Cuomo, and was close friends with Andrew and several senior administration officials, including Percoco. (A555-58/2115-28).

The charges arose from Howe's work for COR and other companies. Aiello and Gerardi sought a severance from their co-defendants, but the district court instead forced them to stand trial twice, splitting the Percoco-related and FSMC-related charges. At least half of each trial revolved around other defendants, and alleged schemes Aiello had nothing to do with. Howe was the government's star witness in the Percoco trial, but on cross-examination he confessed to multiple frauds, embezzlements, and violating his cooperation agreement. (A575-78/2548-60, A579-80/2705-09, A594-97/3103-15, A597/3123). He was arrested mid-cross-examination and did not testify at the FSMC trial.

**B. The Percoco Trial**

1. <u>The Alleged Public-Bribery Scheme</u>.

The Second Superseding Indictment alleged that from August through October 2014, "Howe arranged for [COR] to pay approximately $35,000 in bribe payments" to Percoco "in exchange for Percoco's official assistance…on an as-needed basis." (A292). Count 10 charged Aiello and Gerardi with conspiracy "to deprive the public" of Percoco's honest services, in violation of 18 U.S.C. §1349. (A305-06).[1] Specifically, it alleged that in 2014, "*while serving as Executive Deputy Secretary to the Governor*," Percoco conspired with Aiello and Gerardi to "take *official action* in exchange for bribes" and "deprive the public of its intangible right to Percoco's honest services *as a senior official in the Office of the Governor*." (A305-06 (emphasis added)).

Percoco was not a public official for most of 2014. He formally resigned in April to manage Cuomo's re-election campaign. (A636/5395-97, A636/5402, A739). Although he occasionally used his old office and coordinated with Cuomo's staff about scheduling and other matters, he transitioned his duties to others and no longer had any title or responsibilities in the Governor's Office. (A508/478-79, A509-10/579-83, A528/1201). Numerous government witnesses

---

[1] Aiello was also charged with bribery (18 U.S.C. §666) (Count 14) and false statements (18 U.S.C. §1001) (Count 15). The jury acquitted on these counts.

6

testified that Percoco's resignation marked a definite break with public office and he expressed no intent to return. (A508/476, A509/574, A509/578, A525/1185-86). He could have taken a leave of absence if he intended to separate only briefly, but as Percoco told one administration official, "he was not coming back" because "he needed to make money for his family" after the campaign. (A509/574).

Indeed, as he was leaving, Percoco obtained an ethics opinion about what private work a *former government employee* may undertake. (A525-26/1186-88). The opinion advised that in his "post-State employment" Percoco could not be compensated for "any matter before," or "appear[] or practic[e] before," the Governor's Office and state agencies, but that other private work was permissible. (A726).

During the campaign, however, several senior members of Cuomo's staff departed, and Cuomo's father became ill. (A508/476-77, A511/606-07). Percoco sensed that Cuomo needed him for "stability," and so—months after he resigned—he decided to resume his old position. (A508/476-77). Percoco completed new-hire paperwork and re-joined the Governor's Office on December 8, 2014, after Cuomo's re-election. (A637/5408-11, A734).

It was undisputed at trial that—contrary to the indictment—there was no agreement between Percoco and COR in 2014 "while" Percoco was "serving as Executive Deputy Secretary to the Governor." COR's connection to Percoco came

7

about during the 8-month period when Percoco was *not* a public official, and concerned an issue with Syracuse's Inner Harbor that was resolved *before* he returned to government.

The Inner Harbor, a former industrial and shipping center, had fallen into neglect. (A511/643-44, A531/1257-58). In 2011, Cuomo launched an initiative to revitalize the area as a retail, hotel, and residential center. (A531/1257, A532/1261). Syracuse selected COR as its developer, and the State's Empire State Development ("ESD") agreed to reimburse public infrastructure elements such as sewers, streets, and sidewalks. (A511/644, A512/646-48, A513/653-54).

In the summer of 2014, COR began building a hotel and planned to build a parking lot nearby. (A513/655, A532/1261-62). COR asked ESD to include the lot in its infrastructure financing, but because it would serve not only the public but also the hotel, ESD had to determine whether such funding required a Labor Peace Agreement ("LPA"). (A513/655, A513-14/660-61, A532/1262). An LPA is mandated when a project has a hotel as its "principal function" and allows the hospitality union to meet with workers at the facility. (A532/1263, A630-31/5302-03, A631/5307, A632/5314).

ESD's deputy general counsel, Maria Cassidy, testified that the parking lot's mixed-use nature presented a unique situation, and she found "no guidance in the law." (A633/5324, A635/5376). Cassidy initially assumed that an LPA was

8

required, but concluded otherwise after learning that the hotel was only one element of the Inner Harbor project. (A632/5310-11, A632-33/5323-26, A633-34/5330-32). But for over five months, ESD wrestled internally and with Andrew Kennedy, Cuomo's Assistant Secretary for Economic Development, over whether an LPA was needed. (A514-15/668-72, A534/1269-71, A539/1341-42, A634/5344, A661-72, A692-96, A730-33, A735-38).

Howe worked with COR on the Inner Harbor project and sought assistance from his close friend Percoco. (A531/1258-59, A569-70/2420-21). Howe testified that Percoco told him early in 2014—before he resigned from government—that he had "a significant mortgage payment coming up at the end of 2014" and asked if any of Howe's clients might hire Percoco as a consultant "when he left the governor's office…in…April or May." (A551/2093, A566-67/2408-09).

Accordingly, Howe approached Aiello in June – July 2014 about hiring Percoco for "the Inner Harbor…with this labor peace agreement issue." (A552/2094-95, A567/2409). Howe then forwarded the ethics opinion to his partner, copying Aiello, and wrote, "Steve needs labor relations help on inner harbor and Joe would like to assist." (A676). On July 30—over four months before Percoco would return to office, Aiello asked Howe, "Todd, is there any way Joe P can help us with this issue *while he is off the 2nd floor working on the*

9

*Campaign*[?]" (A680 (emphasis added)).[2]  Aiello explained that he thought the

unions were lobbying ESD to require an LPA, and said, "I could really use a[n]

advocate with regard to labor issues over the next few months."  (*Id.*).  Howe

testified that COR agreed to pay Percoco $5,000/month to assist with the LPA

matter.  (A567/2409-10, A573/2477).

There was no evidence that COR paid Percoco when he was in office.  The

government only identified two COR checks to a Howe entity, from which Howe

paid Percoco.  (A574/2479-80, A575/2483).  On August 11, 2014, Howe invoiced

COR $15,000 ("$5,000.00 per Month x 3," for June – August) for "NYS

Consultation / Labor Strategy-Relations / Labor Financing."[3]  (A686-87).  COR

paid the invoice and wrote a second check to Howe's entity, for $20,000, in

October.  (A728-29).

In the fall of 2014, COR sought Percoco's guidance on how it should handle

the LPA issue.  (A698-709).  Then, on December 3, 2014, *before* he returned to

government, Percoco called Andrew Kennedy about the LPA.  (A535/1273-75,

A540/1345-46).  Kennedy called ESD and—without mentioning Percoco's

---

[2] "2nd floor" refers to the Governor's Office.  (A507/438).

[3] In "June, July or August" 2014, Howe and Percoco also helped COR pursue
pension fund financing for the Inner Harbor project.  (A574/2478, A602/3651-54).
While there was substantial evidence that COR's payments related to that
financing, the evidence is presented here in the light most favorable to the
government.

name—told them "to get it done" and that an LPA "should not be required as part of this project." (A535/1275-76). Nonetheless, although ESD agreed to finance the parking lot without an LPA, COR ultimately did not pursue the grant and never received any funding. (A516/727).

The government claimed the same $35,000 was also paid in exchange for two Percoco communications a year later, in *September 2015*, while Percoco was a state official. First, the State owed COR funding for a film-hub project. (A517/782-85, A713-15). COR's subcontractors threatened to walk off because they had not been paid for work already performed. (A541-42/1379-82, A713-15). At Howe's urging Percoco emailed the Division of Budget ("DOB") and asked which of the payments owed "were able to be processed" and when they would be paid. (A716-17). DOB replied that one of the payments would be made within a week, and Percoco responded approvingly. (A716). Second, Aiello's son worked in the Governor's Office but had not received the standard raise when he was promoted to a new position. (A520/901). Prompted by a text message that Aiello sent to Howe, Percoco emailed several individuals asking why the full raise had not been given. (A522/942-43, A719-25). The salary was then increased. (A519-20/896-97).

There was no evidence that anyone contemplated either issue a full year earlier, when the conspiracy was supposedly hatched and the payments made.

11

Indeed, Howe testified that COR hired Percoco for the LPA and other "labor issues," not the 2015 acts. (A573/2476; *see* A567/2409 (COR hired Percoco "as a consultant, and the foremost and front and center issue was this [LPA] to get resolved."), A572/2469 (COR hired Percoco "certainly because [it] could use Joe on this [LPA] issue"), A604/3854 (Howe and Aiello discussed Percoco helping with the LPA and "other issues relating to that [Inner Harbor] project")). Neither Howe nor anyone else testified that there was any connection between the payments COR made in 2014 and Percoco's 2015 acts.

Nor was there evidence that Aiello had any inkling before December 8, 2014 that Percoco would ever re-join the Governor's Office. All Aiello knew at the time was that Percoco was "off the 2nd floor working on the Campaign" (A680), and, like a lobbyist, could use his contacts to help with labor issues.

2. District Court Rulings And Jury Instructions.

    a. **Public Official Requirement**

The defendants moved to dismiss the indictment to the extent it purported to rely on acts Percoco took when he was not a public official, arguing, *inter alia*, that they were not "official" acts and Percoco owed the public no honest services at the time. (Dkt.187). The government did not contest either point. Instead, the government represented that the honest-services count was premised solely on acts Percoco took *after* he returned to office—specifically, that "Percoco received bribe

12

payments from Aiello and Gerardi while he was on the campaign, but that he took official action to benefit [COR] and Aiello in exchange for those bribes *after* he returned to State service." (Dkt.264 at 75 (government's emphasis); *see id.* at 76 (Percoco "received payments during his time with the campaign and agreed to take official actions in the future, as opportunities arose")). Similarly, the government only identified Percoco's 2015 calls as alleged official acts and did not mention the LPA. (*Id.* at 75). The government never asserted that Percoco owed the public a duty of honest services when he was out of office.

The district court denied the motion. (SA16-20). It accepted the government's theory but added—without citation to any law—that the allegation of Percoco's "continued involvement with the Governor's office" also "suffices." (SA18).

The government proposed jury instructions consistent with its pretrial theory. It requested a charge that "a private citizen…does *not* owe a duty of honest services to the public." (A348 (emphasis added)). Instead, according to the government, a private citizen "can be found guilty of honest services fraud" only if he participates in a scheme "to deprive the public of its right to *a public official's* honest services." (*Id.* (emphasis added)).[4] The defendants, likewise, proposed jury

---

[4] (*See also*, *e.g.*, A349-51 (government "must show that the *public official* obtained for himself or a third-party corrupt payments"; "A bribe or kickback is anything of

13

instructions centered on Percoco's time as a public official.  (A467-68 (government must prove "a scheme or artifice to defraud the State of New York and its citizens of the honest services of a government official—in this case, Mr. Percoco")).

Nonetheless, the district court *sua sponte* injected its own theory.  In draft instructions circulated prior to the charge conference, the court defined the conspiracy's object as the deprivation of Percoco's "honest services"—without qualification—and introduced the idea that Percoco could owe the public honest services even as a private citizen.  (A765-66).  The defendants objected. Consistent with the indictment, they urged the court to specify that the conspiracy's object must be the deprivation of Percoco's "honest services *as a public official*," but the court refused without even soliciting the government's view.  (A641/5824-25; *see also* A640/5765-66, A658/6475).  The defendants also objected that the instructions needed to specify that only a public official "can perform an official act," but the court refused:  "No, I'm definitely not going to say that.  I don't even think that's a correct statement of the law."  (A640/5779-80; *see* A643-44/5833-36).  And the defendants objected that instructing the jury that a

---

value, which is provided to a *public official* in exchange for official action"; government "need only show that *a public official* has obtained a payment or benefit"; scheme-to-defraud element satisfied if government proves "a scheme that deprived the public of *a public official's* honest services") (emphasis added)).

14

private citizen could owe fiduciary duties (and thus honest services) to the public would be a constructive amendment or variance, because the case was not "charged in the indictment" that way "but under an official status as an official actor theory." (A646/5845-47). The court overruled the objection. (A646/5847).

The district court thus instructed the jury that Percoco "owed the public a duty of honest services" not only when employed by the State, but also when he was a private citizen if "he owed the public a fiduciary duty" at that time. (A655/6445-46). To make that determination, it instructed:

> you must determine, first, whether he dominated and controlled any governmental business and, second, whether people working in the government actually relied on him because of a special relationship he had with the government.

(A655/6446).

### b. "As Opportunities Arise"

Prior to *McDonnell*, this Court allowed the government to avoid proving an agreement for a specific official act—or any type of act or even acts on a particular subject matter—as long as the official agreed to "exercise particular kinds of influence…as specific opportunities arise." *United States v. Ganim*, 510 F.3d 134, 145 (2d Cir. 2007). The honest-services charge was predicated on this theory. (A292-93, A305).

The defendants moved to dismiss, arguing that *McDonnell* foreclosed such an indefinite *quid pro quo*. (Dkt.187 at 29-32). The district court denied the

15

motion. (SA8-10). The defendants then requested a jury instruction that a *quid pro quo* requires an agreement on "a specific or identified question or matter." (A641/5808-09; *see* A647/5852). The court refused, and invited the jury to convict if COR made payments with "the expectation that, as a result of the payment, Mr. Percoco would, as opportunities arose, perform official acts" on COR's behalf. (A652-53/6436-37, A656/6449).

      3.  <u>Rule 29 Motions And Verdict</u>.

Before the government rested, the district court asked whether a COR-related extortion count against Percoco (Count 8) should be dismissed because Percoco was not a public official when he received the payments. (A603/3689). After argument, the court dismissed the count and explained its reasoning in a post-trial decision. (A639/5757, A798). The defendants also moved for judgments of acquittal on the remaining counts. (A618-28/5104-41). The district court reserved decision and denied the motions in a footnote to the same opinion. (A802).

The jury convicted Aiello of honest-services fraud conspiracy but acquitted him of related federal-program bribery and false-statement charges. (A659-60/6829-31). The jury acquitted Gerardi on all counts. (A660/6830-31).

16

## C. The FSMC Trial

The evidence and proceedings pertinent to the FSMC counts are described in Argument Points IV-VI.

## D. Sentencing

On December 7, 2018, the district court sentenced Aiello principally to three years' imprisonment. (SA101-07). In connection with the FSMC-related counts, the court concluded that there was no calculable loss under the Guidelines. (A2645/8). The court imposed a $500,000 fine (SA106), and subsequently ordered $898,954.20 in forfeiture (Dkt.981).

Aiello moved for bail pending appeal. (A2645-46/37-42). The district court denied Aiello's motion. (Dkt.978). However, this Court granted bail and stayed Aiello's surrender date. (A2686). The stay will "expire seven days after the merits panel advises counsel that the matter has been submitted for decision, without prejudice to any other action on the matter by the merits panel at that time." (*Id.*).

For the reasons set forth in this brief, Aiello is likely to prevail in his appeal, and accordingly requests that the Court extend the stay through its decision on the merits.

## <u>STANDARDS OF REVIEW</u>

This Court reviews questions of statutory interpretation and constitutionality, and challenges to jury instructions and sufficiency of the evidence *de novo*. *United*

17

*States v. Gayle*, 342 F.3d 89, 91 (2d Cir. 2003); *United States v. Caronia*, 703 F.3d 149, 160 (2d Cir. 2012); *United States v. Silver*, 864 F.3d 102, 117 (2d Cir. 2017); *United States v. Novak*, 443 F.3d 150, 157 (2d Cir. 2006).  The exclusion of defense evidence is reviewed for errors of law and other abuses of discretion. *United States v. Stewart*, 907 F.3d 677, 686 (2d Cir. 2018).  Where exclusion implicates the constitutional right to present a meaningful defense, review is *de novo*.  *E.g.*, *United States v. Lim*, 897 F.3d 673, 684 (5th Cir. 2018); *United States v. West*, 829 F.3d 1013, 1017 (8th Cir. 2016); *cf. United States v. Tropeano*, 252 F.3d 653, 657 (2d Cir. 2001) (Confrontation Clause violation).

## SUMMARY OF ARGUMENT

1.    The honest-services fraud conviction should be reversed or vacated for the following reasons, each of which independently warrants acquittal or at least a new trial:

*First*, the jury instruction permitting conviction on the theory that Percoco could owe a duty of honest services to the public even while not working for the State constructively amended the indictment, which charged a conspiracy involving Percoco's honest services as a public official, not a private citizen.

*Second*, this "private citizen" theory was foreclosed by *McDonnell*, which requires that public-sector bribery crimes—including honest-services fraud— involve "formal exercise[s] of governmental power" by persons with "official

18

position[s]." Because a private citizen is incapable of committing an "official act," retaining Percoco to speak to government officials on COR's behalf could not be an honest-services fraud conspiracy.

*Third*, even if (as the instructions erroneously stated) a private citizen could sufficiently "dominate and control" government affairs to be treated as a public official under the honest-services fraud statute, the facts did not remotely support such a finding. Although Percoco occasionally used his government office and advised government officials while working for the campaign, his influence was nowhere near the "vise-like grip" exercised by the only defendant ever convicted under such a theory (decades ago, before the Supreme Court's modern mail/wire fraud caselaw). And the evidence at most reflected an agreement for Percoco to assist COR as a private citizen, not a public official.

*Fourth*, these errors were compounded by the jury instruction permitting conviction even if Percoco received payments untethered to *any* specific subject matter, action, or type of action. That contravened *McDonnell*'s clear mandate that the jury must identify a specific matter involving the formal exercise of governmental power and find that an official made a decision or took an action, or agreed to do so, on that identified matter.

19

2.      Aiello's wire-fraud convictions should be reversed or vacated for the following reasons, each of which independently requires acquittal or at least a new trial:

*First*, wire fraud requires proof that the defendant contemplated "tangible economic harm" to the victim.  But there was no proof that FSMC got less than it paid for, that the supposedly "tailored" RFP excluded any competitor, or that anyone else could have given FSMC a better deal.  Indeed, FSMC was free to negotiate whatever terms it wanted with whomever it pleased, regardless of any RFP response, and the purported "tailoring" did not impede FSMC from selecting other developers.  Nor was there evidence that Aiello intended to harm FSMC.

*Second*, the instructions were incomplete and confusing and likely misled the jury into believing it could convict even if the government failed to prove that FSMC was deprived of the benefit of its bargain, or of a better deal.  The instructions failed to clearly convey that the object of a wire-fraud scheme must be the deprivation of money or property—a critical requirement under the controlling authorities.

*Third*, the district court precluded defense evidence that COR gave FSMC an excellent deal, on the astonishing premise that such evidence was not relevant.  This ruling deprived Aiello of his constitutional right to present a meaningful

20

defense that demonstrated the absence of economic harm or fraudulent intent, rendering the trial fundamentally unfair.

3.     Pursuant to Federal Rule of Appellate Procedure 28(i), Aiello joins the arguments of co-Appellants Percoco (Points I-III), Gerardi (Points I-IV), Kalayeros (Points I-III), and Ciminelli (Points I-II).

## ARGUMENT

## I.     THE JURY INSTRUCTIONS CONSTRUCTIVELY AMENDED THE HONEST-SERVICES COUNT

The indictment charged a conspiracy to deprive the public of Percoco's honest services as a public official—specifically, "as a senior official in the Office of the Governor"—and the government adhered to that charged object up through the start of trial. Yet the district court on its own initiative injected an alternative theory. Resurrecting *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982), the court instructed the jury that Percoco could owe the public honest services when he was *not* a public official and that the jury could convict if it found a conspiracy to deprive the public of those services. These instructions constructively amended the indictment and deprived Aiello of his constitutional right to have a grand jury determine the charges against him.

### A. Constructive Amendments Are Unconstitutional

The Fifth Amendment guarantees the "right to be tried only on charges presented in an indictment returned by a grand jury." *United States v. Gonzalez*,

686 F.3d 122, 127 (2d Cir. 2012). The Framers insisted on "the intervention of a grand jury" as "a substantial safeguard against oppressive and arbitrary proceedings," *Smith v. United States*, 360 U.S. 1, 9 (1959), and to ensure that no individual's liberty is jeopardized without "charge[s] by a group of his fellow citizens acting independently of either prosecuting attorney or judge," *Stirone v. United States*, 361 U.S. 212, 218 (1960). *See United States v. Thomas*, 274 F.3d 655, 670 (2d Cir. 2001) (the right ensures that no "federal prosecution [is] begun by arms of the Government without the consent of fellow citizens").

The Fifth Amendment guarantees that the charges in an indictment "not be broadened through amendment except by the grand jury itself." *Stirone*, 361 U.S. at 216. "An unconstitutional amendment of the indictment occurs when the charging terms are altered, either literally or constructively," by the government's evidence or the court's instructions. *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997); *see United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005) (constructive amendment "[w]hen the trial evidence or the jury charge operates to broaden the possible bases for conviction from that which appeared in the indictment"). A jury instruction constructively amends the indictment when it "so modif[ies] essential elements of the offense charged that [on review] there is a substantial likelihood that the defendant may have been convicted of an offense

22

other than that charged in the indictment." *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988); *accord Milstein*, 401 F.3d at 65; *Wozniak*, 126 F.3d at 109.

A constructive amendment is "a *per se* violation of the Grand Jury Clause of the Fifth Amendment that requires reversal even without a showing of prejudice to the defendant." *Wozniak*, 126 F.3d at 109; *accord United States v. Hassan*, 578 F.3d 108, 133-34 (2d Cir. 2008); *Thomas*, 274 F.3d at 670; *United States v. Zingaro*, 858 F.2d 94, 98 (2d Cir. 1988).

## B. The Object Of A Conspiracy May Not Be Constructively Amended

Because "the object of a conspiracy constitutes an essential element of the conspiracy offense," any constructive amendment of the object charged in the indictment is *per se* unconstitutional. *United States v. Roshko*, 969 F.2d 1, 5 (2d Cir. 1992); *accord United States v. Gallerani*, 68 F.3d 611, 617-18 (2d Cir. 1995). Indeed, this Court has repeatedly "emphasized the need for particular vigilance" to hold the government to the conspiracy object charged. *Gallerani*, 68 F.3d at 618. This concern is particularly acute for fraud conspiracies, "in view of the broad range of conduct covered by the federal fraud statutes and the risk that a defendant may be convicted of conspiracy based upon an agreement other than that specifically charged." *Id.*

Accordingly, this Court routinely vacates convictions where the jury was permitted to convict for a conspiracy with a different or broader object than that

alleged in the indictment. *See Hassan*, 578 F.3d at 133-34 (indictment charged cathinone conspiracy but jury instructions covered "some controlled substance"); *Wozniak*, 126 F.3d at 111 (indictment charged cocaine conspiracy, but instruction permitted conviction on any controlled substance); *Roshko*, 969 F.2d at 6 (indictment alleged husband's green card was object but case tried on wife's green card also); *Mollica*, 849 F.2d at 730 (indictment charged conspiracy to evade income taxes and obstruct IRS, but instruction charged conspiracy "to defraud the United States").

### C. The Private-Citizen Instruction Constructively Amended The Indictment

Count Ten charged a §1349 conspiracy, the "object" of which was "to deprive the public of its intangible right to Percoco's honest services as a senior official in the Office of the Governor." (A305-06). The indictment nowhere alleged that Percoco owed the public any duty when he was not a public official, nor a conspiracy to deprive the public of Percoco's supposed honest services as a private citizen.

Indeed, the government proceeded all along as if the honest-services count concerned only Percoco's time as a public official. For example, in opposing defendants' pretrial motions, the government argued not that private citizens owe the public honest services, but that Percoco took payments for acts he would take *later*, once he returned to public office. (Dkt.264 at 75). *Cf. Margiotta*, 688 F.2d

24

at 126 (no Fifth Amendment violation where government argued pretrial that private citizen owes honest services once he "undertakes the business of governing"). In fact, as a precaution, Percoco's motion to dismiss discussed and distinguished *Margiotta*'s private-citizen theory of honest-services fraud in depth. (Dkt.187 at 15-16; Dkt.298 at 8). But the government declined to seek refuge in *Margiotta*; its response did not even mention *Margiotta* or acknowledge defendants' arguments.

Similarly, the government requested that the court charge the jury that "a private citizen…does *not* owe a duty of honest services to the public" and commits public-sector honest-services fraud only if he deprives the public of "*a public official's* honest services." (A348 (emphasis added)). It was *the district court* that injected its own theory and instructed the jury that it could find a scheme to defraud the public of Percoco's honest services *either* as a public official *or* as a private citizen. (A655/6445-46, A765-66).

The private-citizen instruction constructively amended the indictment. It invited the jury to convict Aiello for a conspiracy neither presented to nor charged by the grand jury. *See Roshko*, 969 F.2d at 6 (constructive amendment where district court "created a basis for conviction which the grand jury did not intend to create"). Whereas the grand jury apparently focused on every period except the eight months that Percoco was campaign manager, the instruction permitted

25

conviction based on that period alone.  *Cf. Wozniak*, 126 F.3d at 111 (no

constructive amendment if "time, place, people, and object" remain unchanged).

And the instruction deviated from the "core of criminality" alleged in the

indictment.  *Id.*  Intentionally bribing a public official who indisputably owes the

public fiduciary duties is fundamentally different from paying a lobbyist or

civilian, who may or may not owe a fiduciary duty depending on the level of

"dominance and control" he exercises.

> As the Supreme Court explained:

> If it lies within the province of a court to change the charging part of
> an indictment to suit its own notions of what it ought to have been or
> what the grand jury would probably have made it if their attention had
> been called to suggested changes, the great importance which the
> common law attaches to an indictment [by] a grand jury…may be
> frittered away until its value is almost destroyed.

*Russell v. United States*, 369 U.S. 749, 770-71 (1962) (quoting *Ex parte Bain*, 121

U.S. 1, 10 (1887)).  By unilaterally changing the object of the charged conspiracy,

the district court usurped the grand jury's exclusive stopgap function and trampled

Aiello's Fifth Amendment rights.

### D. At A Minimum, There Was A Prejudicial Variance

A variance occurs "when the charging terms of the indictment are left

unaltered, but the evidence offered at trial proves facts materially different from

those alleged in the indictment."  *Mollica*, 849 F.2d at 729.  Unlike a constructive

amendment, only *prejudicial* variances constitute reversible error. *Thomas*, 274 F.3d at 670.

It is indisputable that the private-citizen theory was materially different from the indictment's allegation that Percoco owed honest services only "as a senior official in the Office of the Governor." This variance greatly prejudiced Aiello because prior to receiving the court's draft charge, he had no reason to lay an evidentiary foundation for arguments that Percoco neither "dominated" nor "controlled" governmental business and that no one in state government—let alone the public—relied on him once he walked away from public office.

\* \* \*

The discrepancy between the indictment and the alternative theory on which the district court instructed the jury "destroyed [Aiello's] substantial right to be tried only on charges presented in an indictment returned by a grand jury." *Stirone*, 361 U.S. at 217. His honest-services conviction must be reversed.

## II. THE HONEST-SERVICES CONVICTION IS LEGALLY INVALID AND FACTUALLY INSUFFICIENT

Aiello is entitled to acquittal because his involvement in retaining Percoco was not criminal. The private-citizen theory is legally invalid because *McDonnell* requires at least one participant in *quid pro quo* bribery to be a public official. The theory raises serious constitutional problems and makes no sense in the context of an alleged fraud on the public, because the public places no trust in private citizens

27

who supposedly dominate and control politics behind the scenes. And the evidence is insufficient under either a public-official or private-citizen theory.

## A. The Private-Citizen Theory Is Legally Invalid

### 1. *McDonnell* Requires At Least One *Quid Pro Quo* Participant Who Is A Public Official.

In public-sector honest-services fraud cases, the government must prove "a *quid pro quo* agreement" in which an official "received, or intended to receive, something of value in exchange for an official act." *Silver*, 864 F.3d at 111. "The key inquiry is whether…an intent to give or receive something of value in exchange for an official act has been proved beyond a reasonable doubt." *United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011). In *McDonnell*, the Supreme Court rejected the government's "expansive interpretation of 'official act'" and held that term must be narrowly construed to allay "significant constitutional concerns" with respect to due process, federalism, and democratic process. 136 S. Ct. at 2372-73; *see id.* at 2367-68 (driven in part by "constitutional concerns," "we reject the Government's reading…and adopt a more bounded interpretation of 'official act'").

Absent a promise to perform an "official act" as now defined by *McDonnell*, there is no honest-services fraud. *See United States v. Boyland*, 862 F.3d 279, 290 (2d Cir. 2017) (honest-services instructions erroneous under *McDonnell*); *Silver*, 864 F.3d at 118 (same; vacating conviction); *United States v. Skelos*, 707 F. App'x

28

733, 737 (2d Cir. 2017) (same).  In fact, the *McDonnell* Court interpreted "official act" narrowly to "avoid[] the vagueness concerns" with the honest-services statute. 136 S. Ct. at 2375.

But *McDonnell*'s definition of "official act" requires "governmental power," "authority of…office" and an "official position."  *Id.* at 2368-70.  Under *McDonnell*, a private citizen is legally incapable of delivering the requisite *quo*, and therefore a *quid pro quo* agreement between two private citizens is, as a matter of law, not public-sector honest-services fraud.[5]  Nor can it be a conspiracy to commit honest-services fraud, because at least one member of a conspiracy must be capable of committing the conspiracy's criminal object.  *See Ocasio v. United States*, 136 S. Ct. 1423, 1432 (2016) (conspirators must agree that the object crime will "be committed by a member of the conspiracy…capable of committing it").

*McDonnell* explained that the "official act" requirement has two components.  First, the act's subject matter must be official:  "the Government must identify a question, matter, cause, suit, proceeding or controversy that may at any time be pending or may by law be brought before *a public official*."  136 S. Ct. at 2368 (emphasis added).  This component is "relatively circumscribed"; the

---

[5] A different rule might apply to a private citizen who, unlike Percoco, is formally vested with official governmental authority, *see Dixson v. United States*, 465 U.S. 482, 484, 496-97 (1984), or intends to take public office and perform official acts in that capacity.  But the district court's private-citizen instruction was not tailored to either of these scenarios.

matter must involve the "*formal exercise of governmental power*" and be "within *the specific duties of an official's position*—the function conferred by the *authority of his office*." *Id.* at 2368-69 (emphasis added). The matter must be "focused and concrete" and "be pending either before the *public official* who is performing the official act, or before *another public official*." *Id.* at 2369 (emphasis added).

Second, there must be an official decision or action. "[H]osting an event, meeting with other officials, or speaking with interested parties is not, standing alone, a 'decision or action.'" *Id.* at 2370. "Instead,…the *public official* must make a decision or take an action on th[e] question or matter, or agree to do so." *Id.* (emphasis added). Alternatively, "[a] *public official* may…make a decision or take an action on a [matter] by using *his official position* to exert pressure on *another official* to perform an 'official act,'" or by "us[ing] *his official position* to provide advice to *another official*, knowing or intending that such advice will form the basis for an 'official act' by *another official*." *Id.* (emphasis added).

A private citizen who is neither on the public payroll nor formally vested with official authority—no matter how much informal *de facto* control he supposedly wields—lacks actual "formal…governmental power," "specific duties," "authority of…office," and an "official position," and thus cannot perform official acts under *McDonnell*. This is true even where, as here, the government maintains that the individual pressured an official to act rather than acted himself,

30

since that conduct only qualifies if the individual "us[es] his official position" to exert pressure or provide advice.  *Id.*  Indeed, by describing this type of official action as pressure on, or advice to, "*another* official," *McDonnell* presupposes that the one doing the pressuring or advising is himself a public official.

In opposing bail before this Court, the government argued that *McDonnell* merely defined "official act," and "did not discuss who could perform an official act."  (Dkt.124 at 28-29).  But that is an artificial distinction.  The way *McDonnell* defined "official act," only a public official can perform one.  *McDonnell* thus necessarily limited the class of persons who can participate in public-sector honest-services fraud.

Because only public officials—not private citizens—can perform official acts, a private citizen's agreement to perform some act in exchange for a thing of value necessarily falls short of the "official act" *quid pro quo* required for public-sector honest-services fraud.  Stated differently, providing something of value to a private citizen can never be honest-services fraud on the public because—as a matter of law—private citizens are incapable of performing official acts. *McDonnell* thus invalidates the private-citizen theory on which the district court instructed the jury.

2.  <u>The Private-Citizen Theory Raises Serious Constitutional Concerns</u>.

The potential breadth and malleability of the private-citizen theory also raises the three "significant constitutional concerns" that drove the Supreme Court to narrow the "official act" requirement. *McDonnell*, 136 S. Ct. at 2372-73.

*First*, the First Amendment protects the right to petition the government, including through well-connected, influential lobbyists who are former government officials. *See generally Citizens United v. FEC*, 558 U.S. 310, 355 (2010); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961) ("The right of petition is one of the freedoms protected by the Bill of Rights."). "The basic compact underlying representative government assumes that public officials will hear from their constituents and act appropriately on their concerns…." *McDonnell*, 136 S. Ct. at 2372; *see Citizens United*, 558 U.S. at 359 ("Favoritism and influence are not…avoidable in representative politics…. Democracy is premised on responsiveness.") (quoting *McConnell v. FEC*, 540 U.S. 93, 297 (2003)). The ability of lobbyists and others to not just access, but even influence, public officials "enhance[s] the effectiveness of our representative government." *Green Party of Conn. v. Garfield*, 616 F.3d 189, 206-07 (2d Cir. 2010).

Extending public corruption laws beyond public officials to reach others who wield sufficient "control" over actual officials or government business will

32

cause citizens, lobbyists, and—especially—former officials to "shrink from participating in democratic discourse." *McDonnell*, 136 S. Ct. at 2372; *see United States v. McClain*, 934 F.2d 822, 830-31 (7th Cir. 1991) (rejecting private-citizen theory for Hobbs Act extortion because a control-based standard "might simply prohibit being too successful a lobbyist"); *accord United States v. McFall*, 558 F.3d 951, 958 (9th Cir. 2009); *United States v. Tomblin*, 46 F.3d 1369, 1383 (5th Cir. 1995). To safeguard these important First Amendment rights, a public corruption statute "that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 412 (1999); *accord McDonnell*, 136 S. Ct. at 2373.

*Second*, due process requires that criminal laws have "principled and objective standard[s]" to avoid permitting law enforcement, prosecutors, judges, or juries to define what is criminal. *Johnson v. United States*, 135 S. Ct. 2551, 2558 (2015); *see City of Chicago v. Morales*, 527 U.S. 41, 62 (1999) (holding ordinance with entirely subjective standard unconstitutionally vague); *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (same); *Cramp v. Bd. of Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 286 (1961) (statute using terms not "susceptible of objective measurement" unconstitutionally vague). Moreover, under lenity principles, ambiguous statutes must be construed narrowly in favor of defendants. *Cleveland v. United States*, 531 U.S. 12, 25 (2000); *see Williams v. United States*,

458 U.S. 279, 290 (1982) (courts must not "choose the harsher alternative" interpretation of ambiguous statute).

Clear, bright-line standards are crucial here because the honest-services statute is inherently vague and fraught with potential for prosecutorial misuse. *See, e.g.*, *Skilling v. United States*, 561 U.S. 358, 411 (2010) (rule of lenity "especially appropriate in construing §1346"). That is why the Supreme Court has repeatedly confined it to narrow, well-defined conduct. In *McNally v. United States*, the Court squelched the developing body of caselaw that insinuated an "honest services" prohibition into the mail-fraud statute itself, and refused to "construe the statute in a manner that leaves its outer boundaries ambiguous." 483 U.S. 350, 360 (1987). In *Skilling*, the Court narrowed §1346—Congress's response to *McNally* that prohibits schemes "to deprive another of the intangible right of honest services"—because of the statute's obvious "vagueness problem." Invoking lenity, the Court cabined the offense to its "solid core"—"paradigmatic cases of bribes and kickbacks"—in order "[t]o preserve the statute without transgressing constitutional limitations." 561 U.S. at 404, 407-09, 411. And most recently, in *McDonnell*, the Court strictly construed the "official act" requirement to "avoid" "vagueness concerns." 136 S. Ct. at 2375.

Yet the private-citizen instruction hinged criminality on whether a private citizen "dominates" and "controls" government business, and whether officials

34

"rely" on him. Those are inherently inexact and subjective determinations, about which different people would likely reach different conclusions from the same facts. *See In re VerHoef*, 888 F.3d 1362, 1367 (Fed. Cir. 2018) (refusing to apply "intellectual domination and control" test for sole inventorship of patent because it "is vague and subject to variable meanings"); *United States v. Murphy*, 323 F.3d 102, 114 (3d Cir. 2003) ("the idea of allowing a jury to determine whether a party official acted enough like a government official is itself enough to give us pause"). Vagueness concerns are particularly acute in the arena of lobbying and governmental relations, where access and influence are the name of the game. *See McClain*, 934 F.2d at 831 (Hobbs Act cannot "sweep so broadly as to implicate payments to influential lobbyists"). Except in the extreme scenario where a non-government actor has *exclusive* authority over a government program, project, or decision, who is to say when that individual's participation or influence crosses over to control and dominance? What is the line, for example, between a former-official lobbyist who merely remains chummy with former colleagues, and a former official who dominates and controls them, and how is anyone in Aiello's shoes to know the difference? A private citizen should not be subject to criminal prosecution if in his own assessment his influence did not rise to the level of "control" and "dominance," yet in the prosecutors' and/or jury's eyes it did.

The vagaries of fiduciary duty law, in fact, was a key reason three justices would have held the honest-services statute unsalvageably vague in *Skilling*.  *See* 561 U.S. at 417-19 (Scalia, J., concurring).  The majority responded that this was no impediment if the offense is limited to bribes and kickbacks, where "[t]he existence of a fiduciary relationship, under any definition of that term, [i]s usually beyond dispute."  *Id.* at 407 n.41.  The Court cited three examples: "public official-public, employee-employer, and union official-union members."  *Id.*  A private-citizen theory of public-sector honest-services fraud validates Justice Scalia's concern and produces the ad hoc, case-by-case analyses that the Court intended to obviate.

*Third*, the private-citizen theory raises federalism concerns.  *McDonnell*, 136 S. Ct. at 2373.  Given the potentially limitless scope of §1346, courts should not "construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials."  *McNally*, 483 U.S. at 360; *see Sorich v. United States*, 555 U.S. 1204 (2009) (Scalia, J., dissenting from *cert.* denial) (expressing concern with "the prospect of federal prosecutors' (or federal courts') creating ethics codes and setting disclosure requirements for local and state officials….with the details to be worked out case by case").

3. *McDonnell*, *Skilling*, And *McNally* Supersede *Margiotta*.

The district court patterned its instruction on language in *Margiotta*. But *Margiotta* pre-dated *McDonnell*—and *Skilling* and *McNally*—and thus did not consider *McDonnell*'s implications for the private-citizen theory of public-sector honest-services fraud, or the constitutional reasons for narrow interpretation articulated in *McNally* or *Skilling*. And this Court is not bound by "a prior decision of another panel" "where there has been an intervening Supreme Court decision"— let alone three—"that casts doubt on our controlling precedent." *Wojchowski v. Daines*, 498 F.3d 99, 106 (2d Cir. 2007); *accord*, *e.g.*, *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 405 (2d Cir. 2014); *United States v. Gill*, 748 F.3d 491, 501-02 (2d Cir. 2014). Moreover, the intervening Supreme Court decision(s) "need not address the precise issue already decided by our Court" for that rule to apply. *Union of Needletrades, Indus. & Textile Employees, AFL-CIO, CLC v. U.S. I.N.S.*, 336 F.3d 200, 210 (2d Cir. 2003).

To be sure, this Court has invoked the *Margiotta* fiduciary-duty test in other contexts, including securities fraud and *private*-sector honest-services fraud. *See United States v. Halloran*, 821 F.3d 321, 339-40 (2d Cir. 2016) (fiduciary duties owed by Republican Party officials to party members); *United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (fiduciary relationship for misappropriation theory of insider trading). But we are not aware of a single case in 37 years—other

37

than *Margiotta* itself—that has permitted the dominance-control-reliance test to
serve as a backdoor to criminal liability for public-sector honest-services fraud.
And other Circuits have rejected *Margiotta* on vagueness grounds. *See Murphy*,
323 F.3d at 104, 117-18 (rejecting *Margiotta*'s case-by-case approach, instead
requiring a "clearly established fiduciary relationship or legal duty"); *United States
v. Brumley*, 116 F.3d 728, 734-35 (5th Cir. 1997) (§1346 limited to obligations
"under state law"); *United States v. Holzer*, 840 F.2d 1343, 1348 (7th Cir. 1988)
(*Margiotta* one of "the worst abuses of the mail fraud statute" because it penalized
"conduct not even wrongful under state law").

    *Margiotta*'s fiduciary test is also ill-suited to the public sector.  The thrust of
a fiduciary relationship is that, rather than undertake certain tasks, an individual
trusts someone with superior knowledge or skill in the area to manage those tasks
on her behalf.  *See SEC v. DiBella*, 587 F.3d 553, 564 (2d Cir. 2009) (fiduciary
relationship "characterized by a unique degree of trust and confidence between the
parties, one of whom has superior knowledge, skill or expertise and is under a duty
to represent the interests of the other"); *Chestman*, 947 F.2d at 569 ("A fiduciary
relationship involves discretionary authority and dependency:  One person depends
on another—the fiduciary—to serve his interests."); *AG Capital Funding Partners,
L.P. v. State St. Bank & Tr. Co.*, 11 N.Y.3d 146, 158 (2008) (fiduciary relation
"when confidence is reposed on one side and there is resulting superiority and

influence on the other"). But the public does not repose trust or confidence in individuals who are not public officials and who are neither known to be working for the government nor on the public payroll, or otherwise vested with official authority.

Similarly, the principle undergirding public-sector honest-services fraud is that, "[i]n a democracy, citizens elect public officials to act for the common good. When official action is corrupted by secret bribes or kickbacks, the essence of the political contract is violated." *United States v. Jain*, 93 F.3d 436, 442 (8th Cir. 1996); *see United States v. Silvano*, 812 F.2d 754, 759 (1st Cir. 1987) ("[A] public official acts as trustee for the citizens and the State…and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty to them."); *Shushan v. United States*, 117 F.2d 110, 115 (5th Cir. 1941) ("No trustee has more sacred duties than a public official."). That rationale collapses when the supposed conspiracy concerns acts of a private citizen, who has no "political contract" to breach.

## B. The Evidence Was Insufficient Under Both The Public-Official And Private-Citizen Theories

"[N]o rational trier of fact could have found [Aiello] guilty beyond a reasonable doubt" of conspiring to defraud the public. *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005).

*First*, the private-citizen theory is legally invalid, and there was no proof supporting any valid public-official theory. The evidence depicted, at most, an

39

agreement to use Percoco's significant influence as a *former* official for a discrete issue—the LPA—not for him to undertake official acts while serving in public office.  By the summer of 2014, Percoco had resigned from the Governor's Office and obtained an opinion about "post-State employment activities."  (A509-10/579-83, A528/1201, A636/5402, A726, A739).  He expressed his intent not to return to public service, and—at least as far as Aiello knew—truly had no intent to return. (A508/476, A509/574, A509/578, A525/1185-86).  And the evidence was unequivocal that Aiello sought Percoco's help only while he was "off the 2nd floor working on the Campaign," and only for a "few months."  (A680).  The only payments to Percoco occurred during that period (August – October 2014), and Howe testified over and over again that COR engaged Percoco for the LPA—an issue that was resolved before Percoco returned to office.  (A552/2094-95, A567/2409, A572/2469, A573/2476, A604/3854).  (Although Percoco decided sometime before December 8, 2014 to return to the Governor's Office, there was no evidence that Aiello ever knew before that date that Percoco had any thought of returning.)  Even the district court concluded (when dismissing the extortion count mid-trial) that Aiello's "2nd floor" email and other trial evidence at most "showed that Percoco received payments from COR based on the expectation that he would assist COR while he was on the campaign (that is, while he was *not* a public

official)" or even "'in the process' of becoming a public official." (A812 (emphasis added)).

No rational jury could conclude from these facts, beyond a reasonable doubt, that Aiello and Percoco conspired to defraud the public of Percoco's honest services as a public official. There was no evidence of any agreement or payment after Percoco returned to office, and no evidence that the supposed agreement extended to future official acts if ever, and whenever, Percoco returned to office. Nor could a rational jury conclude that Aiello and Percoco reached an open-ended agreement for Percoco to take acts to benefit COR "as opportunities arose," even assuming the validity of such a theory. The only evidence of an agreement revolved around the LPA issue.

*Second*, even assuming that a private-citizen theory of public-sector honest-services fraud survives *McNally*, *Skilling*, and *McDonnell*, the government failed to prove the "dominance" and "control" that *Margiotta* requires. Margiotta was a local Republican Party boss who wielded enormous power and control over Republican elected officials and their appointees. He "deeply insinuated himself into the affairs of government…to the point that he was in effect undertaking the business of government and not simply the activities of the Republican Party." 688 F.2d at 116. He "exercised a vise-like grip" and "dominated the administration of several basic governmental functions," "had a stranglehold" on

41

local governments, and "controlled…the basic responsibilities" that officials in those governments were supposed to carry out. *Id.* at 116, 122, 127. "[E]verything went through his hands." *Id.* at 122.

The evidence here painted a starkly different picture. Percoco's influence after he left state government did not remotely approach Margiotta's actual control over government decisionmaking. The government leaned heavily on the facts that Percoco continued to have access to the Executive Chamber, occasionally used his old office and telephone, and once wore a vest bearing the State seal. (A530/1253-55, A649/6012).[6] It argued that Percoco did "have an office to sell…literally the office that [he] sat in when he made the call to Andrew Kennedy." (A651/6394). But none of that remotely evidences "dominance and control."

Certainly as Cuomo's campaign manager and good friend, Percoco had access to the Governor. One witness testified that Percoco "knew how the governor felt and thought on an issue" so that he could get a sense of how the governor would react to legislation by talking to Percoco first. (A529/1234-35). Howe testified that Percoco "had the ability to pick up the phone and get things done" because "everybody respected Joe, and everybody interpreted that as something that needed to be done." (A552/2098). Howe further testified about a

---

[6] Jackets and fleeces emblazoned with the State seal were often given as gifts. (A538/1302-03). Wearing such clothing no more connotes official power than does drinking coffee from a souvenir White House mug.

42

few instances in which members of the governor's staff were considering leaving the office, and Percoco convinced them to stay. (A567-68/2412-15). And Percoco himself wrote that he still had "a bit of clout left around here." (A697).

But access, respect, and "clout" are not "dominance and control" that leads to reliance. They amount to "mere influence or minimum participation in the processes of government," and fall well short of the "vise-like grip" and "stranglehold" that this Court found necessary in *Margiotta* to cloak a party boss with fiduciary duties normally borne only by public officials. 688 F.2d at 116, 122. If the ability to make government employees "snap to" with a mere phone call was enough to spawn a fiduciary duty to the public, many public officials (presidents, senators, mayors) would retain their duty of honest services for the rest of their lives—well after they leave office—and be forever barred from working as lobbyists or in government relations on pain of criminal prosecution. That cannot be the law.

*Third*, even if Percoco's influence did rise to *Margiotta*-like dominance and control, there is no evidence that Aiello knew anything about that. *See United States v. Torres*, 604 F.3d 58, 67-72 (2d Cir. 2010) (reversing conviction because defendant was unaware of facts that made the conspiracy criminal; discussing other reversals of conspiracy convictions on same grounds); *United States v. Sawyer*, 85 F.3d 713, 725 (1st Cir. 1996) (government must prove intent to deprive the public

43

of honest services). All Aiello knew was that Percoco was a formerly powerful official who remained close to the governor and had access to those still in the administration. Paying for the influence of someone in that position might be "tawdry" or "distasteful" to some, *McDonnell*, 136 S. Ct. at 2375, but it is not unlawful. And for better or worse, this sort of access and influence is *de rigueur* in our system of representative government. *McClain*, 934 F.2d at 830-31 ("'[I]nfluence-peddling' has become a wide-spread (albeit not universally commended) art form at both the local and national level.").

Aiello's conviction must be reversed.

## C. At A Minimum, Retrial Is Required

Even if this Court finds the evidence sufficient, it should vacate the honest-services conviction and remand for a new trial with a proper instruction that prohibits conviction on the invalid private-citizen theory.

The jury was keenly focused on the private citizen/public official distinction. On the first day of deliberations it asked whether "Percoco ha[d] to be an official public official 100 percent of the time or a small portion of [a related Hobbs Act] charge." (A658/6481). And the jury deliberated for 8 days and received two *Allen* charges. *See Stewart*, 907 F.3d at 689 (length of deliberations and modified *Allen* charge "cut[] strongly against" harmlessness). Its split verdict indicates that it distinguished the bribery offenses based on whether the court's instructions

44

required Percoco to be a public official:  It acquitted Aiello and Percoco under

§666 (requiring "authoriz[ation] to act on behalf of [state] government"

(A656/6451-52)) and acquitted Percoco of Hobbs Act conspiracy (requiring that

Percoco was "a public official at the time of the offense" (A652/6436)), but

convicted Aiello and Percoco for honest-services fraud.  A jury properly instructed

to focus solely on Percoco's time as a public official might well have acquitted

Aiello of honest-services fraud conspiracy.

At a minimum, the erroneous jury instruction made it "possible" that Aiello

was convicted "for conduct that is not unlawful." *McDonnell*, 136 S. Ct. at 2375.

That necessarily precludes a finding "that the errors in the jury instructions were

'harmless beyond a reasonable doubt,'" and requires vacatur. *Id.* (quoting *Neder v.*

*United States*, 527 U.S. 1, 16 (1999)); *accord Silver*, 864 F.3d at 123-24.

## III.  *MCDONNELL* FORECLOSED THE "AS OPPORTUNITIES ARISE" INSTRUCTION[7]

Honest-services fraud requires proof that the public official "agreed to

perform an 'official act' at the time of the alleged *quid pro quo*." *McDonnell*, 136

S. Ct. at 2371; *accord Silver*, 864 F.3d at 111.  Prior to *McDonnell*, this Court

allowed the government to avoid proving an agreement for a specific official act—

or any type of act, or even acts on any particular subject matter—as long as the

---

[7] Two other pending Second Circuit appeals, *United States v. Silver*, No. 18-2380, and *United States v. Skelos*, No. 18-3421, present this same issue.

45

official agreed to "exercise particular kinds of influence…as specific opportunities arise." *Ganim*, 510 F.3d at 144-45. At that time, however, any "act taken under color of official authority" qualified as an "official act" in this Circuit. *Id.* at 142 n.4. Thus, as long as the jury could conclude that the official agreed to act with "official authority"—even if the subject matter, the act, or the type of act were left undefined—the element was satisfied, and an "as opportunities arise" instruction presented no issue.

*McDonnell* forecloses that theory now. As discussed above, *McDonnell* strictly cabined the "official act" requirement so that many things officials do "all the time"—*e.g.*, hosting events, meeting with other officials, speaking with interested parties, expressing support for initiatives—no longer qualify. 136 S. Ct. at 2370-72. The Court acknowledged that certain "distasteful" and "tawdry" conduct is outside the federal criminal bribery laws, but reasoned that its narrow construction was necessary to curb "the broader legal implications of the Government's boundless interpretation." *Id.* at 2375; *see id.* at 2372-73 (refusing to "construe a criminal statute on the assumption that the Government will use it responsibly").

To enforce the Court's limitations and provide "assurance that the jury reached its verdict after finding" actual official action, *id.* at 2374, *McDonnell* mandates that juries make three findings. First, the jury "must identify a [matter]

46

involving the formal exercise of governmental power." *Id.* Second, the jury must determine that the matter is "something specific and focused that is pending or may by law be brought before any public official." *Id.* Third, the jury "ha[s] to find that [the official] made a decision or took an action—or agreed to do so—*on* the identified [matter]." *Id.* Unless it makes these three findings, a jury might "convict[] [the defendant] for conduct that is not unlawful." *Id.* at 2375.

## A. The Instruction Contravened *McDonnell*

The "as opportunities arise" instruction is incompatible with *McDonnell*. It relieved the jury of having to make the mandated findings and allowed it to convict based on an abstract and open-ended promise to act. Indeed, it would be impossible for a jury to make the *McDonnell*-required findings from an official's amorphous agreement to take "official action as the opportunities arose." (A656/6449). Where no specific matter was identified or even contemplated by the parties to the alleged *quid pro quo*, it is impossible to determine if the "matter" to be acted on involves "the formal exercise of governmental power." Similarly, without a specific matter to assess, it is impossible to determine whether that matter was sufficiently "specific and focused." And without specification or understanding as to the matter or the type of action that the official would take, it is impossible to determine whether the official agreed to "ma[k]e a decision or [take]

47

an action…*on* the identified [matter]" and whether the other party intended him to do so.

This is not to say that honest-services fraud requires agreement as to the *specific act* that the public official will take. But the *quid pro quo* must be sufficiently concrete with respect to the *matter(s)* to be acted on, and the *type(s)* of acts to be taken, to give a reviewing court "assurance that the jury reached its verdict after finding" each of the required elements of an official act. *Id.* at 2374.

The district court dismissed *McDonnell* because it did not expressly address the "as opportunities arise" theory. (SA9). But *McDonnell* held that the trial court's instructions "lacked important qualifications, rendering them significantly overinclusive." 136 S. Ct. at 2374. To remedy that defect, the Court mandated that juries be instructed to make the three findings discussed above—which are incompatible with an "as opportunities arise" theory of *quid pro quo*.[8]

---

[8] The district court also leaned heavily on other courts' conclusions that "as opportunities arise" survives *McDonnell*. (Dkt.978 at 16). But those courts focused only on whether *McDonnell* requires that *specific acts* be identified at the time of the *quid pro quo*—a standard Aiello is not advocating. *See*, *e.g.*, *Woodward v. United States*, 905 F.3d 40, 48 (1st Cir. 2018). Likewise, although this Court cited prior "as opportunities arise" law in *Skelos*, 707 F. App'x at 738, the appellants there did not challenge the doctrine because the jury instruction defining "official act" was plainly wrong under *McDonnell*.

48

## B. *McDonnell* Makes *Sun-Diamond* Applicable To Honest-Services Bribery

In *Sun-Diamond*, the Supreme Court held that to prove a violation of the federal-officer gratuity statute, the government "must prove a link between a thing of value conferred upon a public official and a specific 'official act.'" 526 U.S. at 414. The Court based its holding on the statutory requirement that the thing of value be given or received "for or because of any official act," and reasoned that 18 U.S.C. §201(c)'s "insistence upon an 'official act,' carefully defined, seems pregnant with the requirement that some particular official act be identified and proved." 526 U.S. at 406.

In sanctioning the "as opportunities arise" theory prior to *McDonnell*, this Court held *Sun-Diamond* inapplicable to honest-services fraud because the honest-services statute does not "contain the same express statutory requirement" of an official act. *Ganim*, 510 F.3d at 146, 150; *see United States v. Bahel*, 662 F.3d 610, 635 n.6 (2d Cir. 2011) (noting Circuit split on this issue). The Court also stated that there was no need for any nexus to a specific official act because the *quid pro quo* requirement supplies the necessary "limiting principle" in bribery law. *Ganim*, 510 F.3d at 146-47, 150. That reasoning cannot survive *McDonnell*. *McDonnell* held that its narrow definition of "official act" is a necessary limiting principle—in addition to the *quid pro quo* requirement—for bribery both under §201 and the honest-services statute. *See* 136 S. Ct. at 2372-73, 2375. And this

49

Court has since recognized that §201's official act requirement—and *McDonnell*—apply equally to honest-services fraud. *See Boyland*, 862 F.3d at 290 (honest-services instructions erroneous under *McDonnell*); *Silver*, 864 F.3d at 118 (same; vacating conviction); *Skelos*, 707 F. App'x at 737 (same). *See also Skilling*, 561 U.S. at 412 (§1346 "draws content" from §201).

The recent recognition that honest-services fraud, too, "insist[s] upon an 'official act,' carefully defined," is "pregnant with the requirement that some particular official act be identified and proved." *Sun-Diamond*, 526 U.S. at 406. *McDonnell* teaches that "the offense [of bribery] is completed at the time when the public official receives a payment in return for his agreement to perform *specific* official acts." 136 S. Ct. at 2365 (emphasis added). At a minimum, the government must prove the specific matter to be acted on, and the type of act or decision to be taken.[9]

### C. The Error Was Not Harmless

It is undisputed that neither COR nor Percoco contemplated Percoco's assistance with the film hub or Aiello's son's raise in 2014, so the only way for the jury to connect those acts to the payments one year earlier was under an "as

---

[9] Requiring juries to identify the specific matter and type of act or decision is not inconsistent with *Ganim*, which held only that a jury "need not find that the *specific act* to be performed was identified at the time of the promise, nor need it link each specific benefit to a single official act." 510 F.3d at 147 (emphasis added).

opportunities arise" theory. That is undoubtedly why the government relied on this theory in the indictment (A292-93), and hammered it home it in closing argument. (A647/5952-53, A648/5996, A649/6001, A649/6008-09, A651/6384). It argued that Aiello and Gerardi "put [Percoco] on retainer" with the payments in 2014, and he sent emails in 2015 "[i]n return." (A648/5996).

And the jury appears to have been swayed by Percoco's 2015 acts. It convicted Aiello of honest-services conspiracy but acquitted Gerardi, even though Gerardi was more directly involved in the LPA issue. (A688, A698, A700, A707, A710). The likely explanation for the divergent verdicts is that the jury convicted Aiello for Percoco's 2015 acts relating to Aiello's son—with the imprimatur of the "as opportunities arise" instruction.

The "as opportunities arise" error, therefore, was not harmless. At a minimum, the instruction made it "possible" that Aiello was convicted "for conduct that is not unlawful" under the honest-services fraud statute, *McDonnell*, 136 S. Ct. at 2375—namely, entering an agreement untethered to any legally sufficient "matter" or "act."

## IV. AIELLO IS ENTITLED TO ACQUITTAL ON THE WIRE-FRAUD CHARGES

The elements of wire fraud are "(i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate wires." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000). The first element requires the government to prove

"(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *Id.* For fraudulent intent, the proof "must show that some actual harm or injury was *contemplated* by the schemer." *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994); *accord United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987). This must be "tangible economic harm" to the victim. *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017); *accord United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994). Wire-fraud conspiracy likewise requires fraudulent intent. *See Torres*, 604 F.3d at 65.

Aiello's convictions at the second trial for defrauding and conspiring to defraud FSMC must be reversed because the government failed to prove the first two wire-fraud elements. The government's theory of economic harm is legally and factually invalid, and it failed to establish the requisite fraudulent intent or material misrepresentations.

### A. Background

#### 1. FSMC RFPs.

Cuomo launched the "Buffalo Billion" initiative to promote economic development in upstate New York. Alain Kaloyeros, SUNY Poly's president, was tapped to select projects in cities including Syracuse and Buffalo. He oversaw this process through FSMC, a non-profit established to allow SUNY entities to finance

52

and manage real estate construction while avoiding cumbersome state procurement rules. Kaloyeros served on FSMC's board of directors. (A1034-35/163-64, A1036/169-70, A1037/173-74, A1041/189-90, A1041-42/209-12, A1048/235-37, A1056-57/303-07, A1232/1252, A1276/1426).

In 2013, FSMC issued two RFPs soliciting bids to become its "preferred developer" in Syracuse and Buffalo. (A1044/220-21, A1046/227-28). These "were more speculative" than traditional RFPs, which solicited bids for specific projects. (A1050/243). Neither RFP identified any specific project, nor was any specific project contemplated in Syracuse at the time. Instead, the purpose was to identify developers interested in a strategic partnership. (A1050/242-43, A1149/896). The RFP winner(s) merely obtained the ability to negotiate with FSMC for contracts in that region. There was no guarantee that any winner would obtain any contract. Even after selecting the winner, FSMC could negotiate with other candidates or terminate the process. (A1044-45/221-22, A1065-66/340-46, A1069/355, A1082/435, A1096/492). As the government conceded, preferred-developer status was not "property." (A996/116, A996/120-21).

FSMC selected COR as the Syracuse preferred developer, and subsequently negotiated contracts with COR to build a film hub and a manufacturing plant. (A1039/180-83, A1422/2217). FSMC selected two preferred developers for

53

Buffalo, including LPCiminelli, which negotiated a contract for a Buffalo project. (A1037-38/175-76, A1054-55/298-300, A1066/346).

2. <u>Government Theory</u>.

The indictment charged all Appellants except Percoco with participating in a wire-fraud conspiracy, and with wire fraud. Kaloyeros, Aiello, and Gerardi allegedly worked with Howe to "tailor" the Syracuse RFP to favor COR while deceiving FSMC into thinking there was an "open competition." (A285-87). Similarly, Kaloyeros and LPCiminelli executives allegedly tailored the Buffalo RFP to favor LPCiminelli. (A285-87).

There was no suggestion that Kaloyeros was bribed or had any financial interest in COR or LPCiminelli; rather, he was allegedly currying political favor. (A1013/38-41). The government alleged that if FSMC had known that Kaloyeros was "steer[ing] the contracts to *his* preferred developers," it "may well" have "negotiated better deals" with "other developers." (A850). Supposedly, this defrauded FSMC of its "right to control its assets" (A294-97)—a theory ungrounded in law or fact.

3. <u>Aiello's Perspective</u>.

Aiello had no reason to believe he was deceiving FSMC, much less defrauding it. In July 2013, he met Kaloyeros in Syracuse to discuss Cuomo's development initiative. Afterwards, Kaloyeros emailed Aiello that he was

"looking forward to our partnership to help advance Governor Cuomo's innovation-driven economic prosperity." (A1643). Later that month, Howe scheduled a tour of SUNY Poly and a meeting with Kaloyeros for Aiello and his team. This was no secret; Howe even suggested that Dean Fuleihan, the chair of FSMC's board, or Michael Fancher, a SUNY Poly staffer tasked with business partnerships, be invited. (A1714, A2539, A1048/235, A1355/1852-53). Neither was an alleged co-conspirator.

Over the following months, Howe forwarded emails to Gerardi and Aiello suggesting that FSMC was interested in working with COR and obtaining input concerning potential RFPs. In most cases, Aiello did not respond or follow up after receiving these emails. (*Compare* A1961-63 (government's email timeline), *with* A2532-34 (emails Aiello sent)). For instance, Gerardi sent bullet points concerning COR's qualifications to Howe, who said he would forward them to Kaloyeros. (A1700-03). The following week, Howe forwarded an email in which Kaloyeros told Fuleihan that "we should focus on the discussions we had with the developer and begin the partnership," and asked Fuleihan "to issue an RFP for a strategic developer partner in Syracuse." (A1645). The next month, Howe sent Aiello and Gerardi a draft RFP that FSMC was "fine tuning." (A1650). In response, Gerardi sent some comments and suggested edits (discussed below), and

Howe emailed Gerardi and Aiello to say he had discussed one of them with Kaloyeros. (A1712).

A week before the RFP was issued, Howe sent Aiello the near-final draft. (A1685). Aiello forwarded it to Gerardi and COR legal counsel Catherine Johnson (A1420/2208), so they could "start preparing [a] response." (A1685). Johnson, a lawyer, was not alleged to be a co-conspirator. That evening, Aiello had dinner with Kaloyeros, Fuleihan, and Richard Leckering (SUNY Poly's outside counsel), then emailed Kaloyeros that he "enjoyed spending time with [them]" and was "honored to be considered by [SUNY Poly] for future development opportunities." (A1687; *see* A1686). Aiello again met with Kaloyeros and Fuleihan a few weeks after the RFP was issued. (A1697).

At one point during the process, Aiello supposedly expressed concern to Howe about one competitor's interest in the RFP. (A1713). The government found this suspicious, but no developer would have been thrilled by that news. The competitor did not submit a response to the RFP, but COR did.[10]

---

[10] In a disclosure form attached to its RFP response, COR stated that it had not engaged lobbyists to influence the procurement (A1803), which the government alleged was false. But it was not clearly false (*see* Gerardi Br. 32 n.30), and regardless, Gerardi prepared the form, not Aiello. (A1803). Gerardi copied Aiello on an email asking Howe if Gerardi's answer to the "attached lobbying form" was correct (A1704), but there was no evidence that Aiello saw or understood the email or attachment.

56

4. Alleged "Tailoring".

When Howe sent Gerardi and Aiello a draft RFP two months after the first meeting, Gerardi provided comments and suggested edits. (A1650-61). The government claimed he was "tailoring" the RFP to favor COR. Gerardi's hand-marked suggestions, however, would have made the RFP *more* competitive and *less* restrictive:

- Gerardi suggested reducing the requirement that the developer have at least 15 years' experience—even though COR satisfied it. (A1656, A1098-99/536-37, A1328/1693, A1507/2694).

- Gerardi proposed broadening the types of relevant experience identified in the RFP—even though COR routinely built the "Class A office space" required in the draft. (A1656, A1420/2210, A1507/2696).

- Gerardi proposed omitting "specific [software] programs"—even though COR used them. (A1656, A1508/2697).

- Gerardi proposed broadening a provision requiring experience with developer-"owned" infrastructure to include developer-"constructed" infrastructure—even though COR satisfied the narrower requirement. (A1657, A1420/2210, A1508/2698).

- Gerardi proposed broadening a provision that required experience with large-scale initiatives even though COR would have satisfied it as written. (A1657, A1420-21/2210-11, A1508/2698-99).

- Gerardi proposed eliminating a performance-bond requirement—even though COR regularly issued performance bonds. (A1659, A1421/2211, A1508/2699).

- Gerardi proposed making the financial-statement requirement more flexible by not requiring audited statements. (A1660, A1665).

Gerardi's access to the draft was not unusual. It was common for entities like FSMC to communicate with potential bidders to improve their RFPs. (A1044/219, A1057-58/307-11, A1090/466-67, A1140-41/849-51, A1142/855, A1233-34/1255-58, A1278/1436, A1279-80/1440-41). Moreover, FSMC's board chair, staffers, and lawyers were involved in drafting, reviewing, editing, and issuing the RFP, and they could have rejected any improper provision. (A1050/243-45, A1080/426, A1152/910-11, A1153-54/915-16, A1155/922, A1572-74, A1650, A2542). Indeed, FSMC rejected certain of Gerardi's proposals, even though they would have made the RFP less restrictive. (*E.g.*, A1656-57, A1675-76).

The government argued that the Syracuse RFP principally favored COR by (1) requiring over 15 years' experience; (2) mandating competence in computer programs, "such as" certain programs COR used; and (3) permitting bidders to submit a reference letter from a bank, rather than insisting on an audited financial statement. (A1459/2462-63, A1466-67/2492-94, A1675-76, A1678). But again, Gerardi had proposed removing the first two provisions, and the third increased competition, rather than excluding it.

Indeed, FSMC personnel testified that the Syracuse RFP was fair, sensible, and not slanted in favor of any developer (A1088/458-59, A1093/478-79, A1096/490, A1152/908-09, A1171/1007-08), and that the allegedly "tailored"

58

provisions were eminently reasonable (A1063-34/332-35, A1065/340, A1088-89/460-62, A1154-55/918-20, A1165/981).  And the Syracuse RFP was virtually identical to the Buffalo RFP—even though COR and LPCiminelli had very different qualifications—and was so broadly applicable that FSMC used it as a model for several RFPs issued in other regions of New York.  (A1061/326, A1092/474-76, A1167-68/992-95, A1237-38/1271-73, A1262/1371-72, A1285/1463, A1670-78, A1885-93, A1909-17, A2218-26, A2237-46, A2258-66).

     5.  <u>RFP Process</u>.

FSMC personnel also testified that the ultimate decision was fair.  (A1066/344, A1067/347-48, A1152/908-10).  Neither COR nor Kaloyeros did anything to exclude COR's potential competition.  Kaloyeros encouraged FSMC to respond to potential bidders' inquiries even if they had missed RFP deadlines ("the more the merrier," he said).  (A1148-49/895-96, A1157-58/951-54).

Ultimately, only COR responded to the RFP.  This was unsurprising, because FSMC did not contemplate any projects in Syracuse at that time.  (A1069/356-58).  There was no suggestion that the allegedly "tailored" RFP provisions discouraged any developer from responding.  FSMC's evaluation committee and board selected COR on the merits and without input from Kaloyeros, who recused himself.  (A1068/352-54, A1143/861-62, A1163/973-75, A1164/977-78, A1426/2266-68, A2530).

59

After COR was selected, it engaged in protracted, arms-length negotiations with experienced FSMC procurement staff, who tried "to get the best deal they could get." (A1096-97/491-94, A1097/496, A1421-22/2212-17). FSMC could have issued RFPs for each project to compare bids based on price, but chose not to. (A1089/464, A1090/466, A1145/868).

There was no evidence that COR's work was not excellent; that FSMC got less than what it paid for; that any other developer would have provided a better deal; or that Aiello or Gerardi intended to deceive or harm FSMC.

Even after Aiello and Gerardi were convicted, FSMC continued to work with COR on the very projects they had allegedly procured by fraud. One year after the indictment, state development authorities commissioned a third-party audit of the film-hub project, which determined that the payments to COR were reasonable. Accordingly, FSMC paid COR the millions it was owed and even hired COR to manage the film hub. FSMC plainly did not believe it was deprived of a better deal. It did not even demand renegotiation of the contracts. In fact, while Aiello and Gerardi were on trial, FSMC amended its contract for the manufacturing-plant project to *increase* the price paid to COR. (A2598, A2600-01).

6. <u>Rulings Below</u>.

Defendants moved to dismiss all wire-fraud-related charges because the indictment failed to allege any scheme to defraud FSMC of property:  FSMC got what it bargained for; the defendants contemplated no injury to FSMC; and the government's right-to-control theory was untenable.  (Dkts.177, 220, 237, 283, 293, 299, 308-10, 314-15, 333-34, 337-38).  The Court denied the motions.  (SA1-2).  Moreover, before and at trial, defendants sought to introduce evidence that they did good work for FSMC and gave FSMC what it paid for, but the court excluded it.  (*See* Point VI *infra*).

At trial, the defendants objected to the legal validity of the government's right-to-control theory, including when moving for acquittal, and objected to instructing the jury on it.  (A1129/803, A1392/2078, A1439-40/2356-58, A1548/2860).  Aiello also moved for acquittal because the evidence was insufficient.  (A1385-88/2048-60, A1389/2066-68, A1392/2078, A1398/2120-21, A1418/2199; Dkt.840).  The court denied the motions.  (A1449-50/2425-26, A2645/2).

At sentencing, the court recognized that FSMC had not lost any money, and accordingly rejected the government's Guidelines loss arguments.  (A2645/8).

61

## B. FSMC Received The Benefit Of Its Bargain

Aiello did not commit wire-fraud conspiracy or wire fraud because FSMC undisputedly got what it paid for. To be guilty, defendants must "contemplate[] some actual harm…to their victims," *Starr*, 816 F.2d at 98, involving a deprivation of "money or property," *Finazzo*, 850 F.3d at 107-08. In this Circuit, "property" includes "the right to control the use of one's assets," which "is injured when a victim is deprived of potentially valuable economic information it would consider valuable in deciding how to use its assets." *Id.* at 108. However, proof that misrepresentations "affect[ed] [the victim's] decision of how to use [its] assets" or that the victim would have refused to deal had it known the truth is insufficient. *Id.* at 111-12. The scheme must "implicate tangible economic harm," such as by "increasing the price" or providing "lower-quality goods." *Id.* at 111.

This Court "ha[s] repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain," even if the defendant acted dishonestly. *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015); *see*, *e.g.*, *Novak*, 443 F.3d at 159 (reversing conviction despite kickback scheme because victims "received all they bargained for"). It is not criminal to induce a transaction by deceit if the alleged victim "receive[s] exactly what [it] paid for," so that "there [i]s no discrepancy between benefits 'reasonably anticipated' and actual benefits received." *Starr*, 816 F.2d at

62

99; *accord United States v. Shellef*, 507 F.3d 82, 109 (2d Cir. 2007) ("fraudulent inducement[] to gain access to" a deal is not wire fraud); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970) ("false reason for being able to offer [a] bargain" is not mail fraud); *United States v. Takhalov*, 827 F.3d 1307, 1319 (11th Cir. 2016) ("scheme to trick patrons to come into a bar…is not wire fraud" if resulting sales are honest).

There was no evidence that Aiello deprived, or intended to deprive, FSMC of the benefit of its bargain with COR. The government argued that COR's supposed tailoring rigged the RFP process and thus established fraud. But the "preferred-developer" status that COR won was not property, as the government conceded (A996/116, A996/120-21), and it did not entitle COR to anything. It meant only that FSMC chose to negotiate with COR to determine whether to engage COR for potential projects. The government did not even try to prove that COR defrauded FSMC during those negotiations, or that, in performing the contracts, COR overcharged or failed to deliver. (A997/123-25, A1000/137, A1002/145, A1130/807-08, A1470/2506-07).

Accordingly, Aiello intended and caused no harm because COR undisputedly gave FSMC exactly what it paid for. Even if FSMC was deceived into negotiating with COR, there was no deceit in the ultimate bargain, and thus no fraud. *See Binday*, 804 F.3d at 570.

63

### C. There Was No Evidence That FSMC Lost A Better Deal

The district court concluded that whether FSMC received the "benefit of the bargain" was irrelevant because FSMC was "deprived…of knowledge that [it] could have gotten a better deal." (A1292/1490-91, A1002/143-44). But even if evidence of a "better deal" would have sufficed, the government presented none. It never even argued that another developer would have provided a better deal than COR. Its theory was that FSMC was defrauded if some "hypothetical other preferred developer [c]ould have agreed to or proposed [better] terms," and that defendants were guilty unless they "prove[d]…the [deal] couldn't possibly have been better." (*Id.*).

This Court's precedents preclude such a theory. Whenever a victim was duped into a deal, but got exactly what it paid for, it might *conceivably* have gotten a better deal somewhere else. Yet this Court has repeatedly held that a hypothetical possibility of harm does not prove fraud. *E.g.*, *Shellef*, 507 F.3d at 109 (not enough to "induce [victim] to enter into a transaction it would otherwise have avoided"); *Novak*, 443 F.3d at 159 ("hypothetical contention" that contractors would have paid less had they known about kickbacks was "inadequate" to show "fraudulent intent"); *Mittelstaedt*, 31 F.3d at 1217 ("disagree[ing]" with government's contention that "it d[id] not matter whether the [victim] would have suffered some economic loss if the scheme had been successful"); *Starr*, 816 F.2d

64

at 99-100 ("metaphysical" harm insufficient); *Regent*, 421 F.2d at 1182 (requiring "evidence from which it [could] be inferred" that "actual injury" was "reasonably probable"); *see also* Br. of U.S., *Finazzo*, No. 14-3213 (2d Cir.), Dkt.84 at 39 n.11 (conceding there is no wire fraud where the "deception employed…d[oes] not address any aspect of the ultimate bargain").

Instead, the question is whether "the scheme, if it were to succeed, *would* result in economic harm to the victim." *Binday*, 804 F.3d at 582 (emphasis altered); *accord id.* (defendant must intend to induce transactions that would cause victim "some economic harm"). In *Mittelstaedt*, for example, the defendants bribed an official to have a town buy their property. This Court held that the government "had to establish…actual [or intended] harm…of a pecuniary nature *or* that the [town] could have negotiated a better deal…had it not been deceived." 31 F.3d at 1217. Because the jury was never asked to determine whether the bribe "inflated the cost…to the town," this Court reversed. *Id*. at 1219-20.

The district court relied on *Finazzo*, but the "better deal" there was not merely theoretical. The defendant "used his control over Aéropostale's vendor selection and pricing to steer [its] business towards" a company he secretly owned "in a manner that inflicted tangible economic harm." 850 F.3d at 113-14. "Aéropostale did not freely bargain" because Finazzo "commit[ted] [it] to paying excessive prices." *Id.* at 115. His vendor "provided inferior products and charged

65

higher prices than other vendors," but he "refused" to switch vendors "despite estimates that it would save Aéropostale $5-6 million." *Id.* at 113-114. There was "ample evidence" that Finazzo "directly prevented Aéropostale from receiving the best possible bargain" and that "Aéropostale was harmed by its dealings with" the vendor. *Id.* at 114; *see also id.* at 114 n.21 (relying on "[t]his evidence of the inferiority of Aéropostale's contracts with" that vendor).

Here, the government did not even attempt to present such evidence. The district court recognized that "this [wa]s a very difficult case" (A1130/810) and "different from *Finazzo*," where it was "a lot easier to see…the economic harm." (A877/29). There was no evidence that anyone could have offered a better deal than COR. The government called two witnesses interested in the *Buffalo* RFP who testified about their normal range of fees. (A1297/1512, A1322-23/1612-13). But they did not testify about fees in Syracuse or what they would have charged for COR's projects, and the government conceded that they might have charged as much as COR. (A1472-73/2517-18). Nor was there evidence that the RFP excluded any developer—let alone one with a better deal. The two Buffalo witnesses were not interested in Syracuse, and the other Syracuse developers chose not to respond to the RFP or responded far too late. (A1158-62/954-69). Thus, even if the government proved its claim that the RFP process was "rigged" (*e.g.*, A1473/2518)—which it did not—it failed to prove even the potential for harm.

66

The government also relied on generic testimony that "competitive" RFP processes are beneficial because they permit the comparison of bidders. (A1049/238-39, A1053-54/294-95, A1080/426, A1134/824-25, A1135/828, A1317/1589, A1317/1591). But the RFP was "competitive." There was no evidence FSMC would have drafted it differently to attract more competition or select the best developer. According to FSMC personnel, the RFP was fair and the allegedly "tailored" provisions were appropriate. Indeed, FSMC accepted the RFP results, rather than negotiating with other developers.

At bottom, the government claimed that without the "tailoring," FSMC *might* have chosen another developer, who *might* have offered a better deal. But by that logic, *any* change to an RFP is "harmful" because it could conceivably lead to a worse result. Such "speculation," unsupported by "affirmative proof," is insufficient to support a conviction. *E.g.*, *United States v. Coplan*, 703 F.3d 46, 76 (2d Cir. 2012); *D'Amato*, 39 F.3d at 1256; *Starr*, 816 F.2d at 99. Indeed, even if "one could argue, based on reasonable speculation, that [a better deal] was 'likely' or 'probable,'" that would not establish harm "beyond a reasonable doubt." *United States v. Pauling*, No. 17-2539-CR, ---F.3d---, 2019 WL 2220129, at *8 (2d Cir. May 23, 2019). The convictions must be reversed. *Id.* at *4-5, *8-9 (affirming judgment of acquittal based on distinction between "permissible inference and

impermissible speculation" that can exist even when "a disputed fact…is within the realm of possibility").

## D. There Was No Evidence That Aiello Harbored Fraudulent Intent

Reversal is independently required because no rational jury could find proof beyond a reasonable doubt that Aiello had "fraudulent intent" and "contemplated some actual, cognizable harm" to FSMC. *Finazzo*, 850 F.3d at 107 n.15.

*First*, there was no evidence that Aiello intended to deceive FSMC. The government claimed the primary "misrepresentations" came from Kaloyeros, who supposedly misled his fellow FSMC board members into believing that COR was selected through a competitive RFP. (A849-50). But the evidence showed that, as far as Aiello knew, FSMC knew COR was interested in the RFP and had provided input. Aiello communicated not only with Kaloyeros, but also Fuleihan, FSMC's board chair. Aiello had no reason to believe that Kaloyeros was acting improperly or deceiving Fuleihan. Consequently, he had no reason to believe that FSMC was being deceived. *Cf. D'Amato*, 39 F.3d at 1258 ("a person cannot be found to intend to harm a corporation…if he or she follows the instructions of an appropriate corporate agent who appears to be unconflicted and acting in good faith").

Nor did Aiello make any misrepresentations, let alone material ones. COR's only arguable misstatement to FSMC was its failure to identify Howe in the

lobbying disclosure form attached to its RFP response.  But Howe was not a lobbyist, Aiello did not prepare the form, and he likely never saw it.  (*See supra* at 56 n.10).  And there was no proof the omission was "material"—that is, "capable of influencing" FSMC.  *Neder*, 527 U.S. at 16, 24-25; *see United States v. Litvak*, 808 F.3d 160, 172-74 (2d Cir. 2015) (reversing convictions because "evidence of [the misstatement's] capability to influence must exceed mere metaphysical possibility").

*Second*, there was no evidence that Aiello intended to deprive FSMC of a better deal.  He did not "tailor" the RFP or request "tailoring."  Only Gerardi marked up the draft RFP.  And Gerardi's proposed edits would have increased, not stifled, competition.  Furthermore, the government's witnesses confirmed that the final RFP was entirely fair and reasonable.  (*See* Point IV.A.4 *supra*).

Even if Aiello knew his co-defendants were deceiving or exploiting FSMC, his knowledge would not establish fraudulent intent.  "It is not sufficient that [the] defendant realizes that the scheme is fraudulent and…has the capacity to cause harm…."  *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999); *accord United States v. Ganji*, 880 F.3d 760, 776 (5th Cir. 2018) ("kn[owing] something criminal [i]s afoot" is "not enough").  The government must prove "the defendant had a conscious knowing intent to defraud…[and] intended some harm to the

property rights of the victim." *Guadagna*, 183 F.3d at 129. But here, there was no evidence that Aiello intended to rig the RFP or to deceive or harm FSMC.

### E. The Right-To-Control Theory Is Invalid

While circuit precedent holds that the "right to control" assets is "property" for purposes of mail/wire fraud, Aiello preserves for further review the argument that the right-to-control theory is legally invalid. The theory contravenes the text of the mail/wire fraud statutes, which apply only to schemes to "obtain[]" "money or property," 18 U.S.C. §§1341, 1343, and the Supreme Court's decisions interpreting that text.

*First*, only traditional, transferrable "property" interests can be "obtained" by the defendant. The mail/wire fraud statutes do not reach schemes to deprive victims of amorphous, intangible rights like the "right to control." *See Cleveland*, 531 U.S. at 24 (regulatory license "is not…appropriately labeled 'property'"); *McNally*, 483 U.S. at 356, 359-60 (mail-fraud statute "protects property rights," not "the intangible right…to good government"). Accordingly, other circuits have expressly rejected the right-to-control theory. *See United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014) ("the ethereal right to accurate information….fall[s] outside th[e] [wire-fraud] statute"); *United States v. Bruchhausen*, 977 F.2d 464, 470 (9th Cir. 1992) (manufacturers' "intangible interest…in controlling the destination of their products" was not "property" under wire-fraud statute).

70

*Second*, to violate these statutes, the defendant must "obtain" the victim's property.  As the Supreme Court explained in *Skilling*, "the victim's loss of money or property supplie[s] the defendant's gain, with one the mirror image of the other."  561 U.S. at 400.  Thus, "an actual []or…potential transfer of property from the victim to the defendant is essential."  *United States v. Walters*, 997 F.2d 1219, 1224 (7th Cir. 1993).  Similarly, in *Sekhar v. United States*, 570 U.S. 729 (2013), the Supreme Court held that "property" under the Hobbs Act must be "*obtainable*" and "*transferable*—capable of passing from one person to another."  *Id.* at 734, 737.  It concluded that an employee's "right to give disinterested legal advice" was not property, because while another person could interfere with that right, he could not "acquire" it.  *Id.* at 738.  This reasoning applies equally to mail/wire fraud.  Indeed, *Sekhar* found *Cleveland* instructive because there, the Court had "held that a 'license' is not 'property' while in the State's hands and so cannot be 'obtained' from the State."  *Id.* at 737.

The "obtainability" requirement is not satisfied here, nor could it be in any right-to-control case.  The government claims the defendants deprived FSMC of the right to control its assets, but they did not "obtain" that right and could not exercise it themselves.  This asymmetry will always occur when the victim's alleged loss is the right to control, because that right is not something the defendant can "transfer" to himself.

71

This Court disagreed in *Finazzo*, relying on circuit precedent holding that, unlike the Hobbs Act, "the mail and wire fraud statutes do not require a defendant to…seek to obtain property." 850 F.3d at 107. But all three statutes use the word "obtain," and there is no reason to avoid reading that term "literally." *Id.* at 106. *Finazzo* also failed to consider *Skilling*'s teaching that, for mail and wire fraud, the "victim's loss…supplie[s] the defendant's gain." 561 U.S. at 400. And while *Finazzo* "decline[d] to construe *Sekhar*'s reference to *Cleveland* as an extension of *Sekhar*'s obtainability holding to…mail and wire fraud," 850 F.3d at 107 n.14, it missed the mark. *Sekhar* explicitly said that *Cleveland* "reversed a…mail-fraud conviction for '*obtaining* money or property'" because "a 'license' is not 'property' while in the State's hands and so cannot be '*obtained'* from the State." *Sekhar*, 570 U.S. at 737 (emphasis added). *Sekhar* did not "extend" the obtainability requirement; mail and wire fraud already required it.

Even the district court acknowledged that defendants "may be right," and that "[w]hen [they] get to the Supreme Court, [it] may say, [t]here is no right of control theory, this is cockamamie." (A1128-29/802-03).

## V. THE WIRE-FRAUD INSTRUCTIONS WERE ERRONEOUS, INCOMPLETE, AND CONFUSING

At a minimum, Aiello is entitled to a new trial because the wire-fraud instructions permitted conviction for non-criminal conduct and could only have confused the jury.

72

After overruling defendants' objections and most of their proposed alternative instructions (A1438/2352-53, A1439/2356, A1449/2424, A888, A958), the district court instructed the jury:

> [I]n order to prove a scheme to defraud, the government must prove that the alleged scheme contemplated depriving [FSMC] of money or property. Property includes intangible interests such as the right to control the use of one's assets. The victim's right to control the use of its assets is injured when it is deprived of potentially valuable economic information that it would consider valuable in deciding how to use its assets. In this context, "potentially valuable economic information" is information that affects the victim's assessment of the benefits or burdens of a transaction, or relates to the quality of goods or services received or the economic risks of the transaction. If all the government proves is that the defendant caused [FSMC] to enter into an agreement it otherwise would not have, or caused [FSMC] to transact with a counterparty it otherwise would not have, without proving that [FSMC] was thereby exposed to tangible economic harm, then the government will not have met its burden of proof. In this regard, economic harm is not limited to monetary loss. Instead, tangible economic harm has been proven if the government has proven that the scheme, if successful, would have created an economic discrepancy between what [FSMC] reasonably anticipated it would receive and what it actually received.

> [I]t is not necessary that the defendant actually realized any gain from the scheme, that [FSMC] actually suffered any pecuniary loss, or that the scheme was completed.

(A1554-55/2884-85).

For the reasons explained in Point IV *supra*, these instructions violate this Court's right-to-control caselaw. They "misle[d] the jury as to the correct legal standard [and] d[id] not adequately inform the jury of the law,"

73

requiring a new trial. *United States v. Kopstein*, 759 F.3d 168, 172 (2d Cir. 2014). But even if the district court's view of the law were correct, vacatur would be required because "the charge was highly confusing." *Id.* at 172. While it used "words culled from the opinions of appellate courts," they were "torn from their context" and "form[ed] a confusing amalgam," *United States v. Pagano*, 224 F.2d 682, 684 (2d Cir. 1955), that was likely "unintelligible to the average juror," *United States v. Christmann*, 298 F.2d 651, 653 (2d Cir. 1962). Moreover, by omitting key clarifying language, the district court created "unbalanced" and misleading instructions that prevented a fair trial. *United States v. Dove*, 916 F.2d 41, 45-47 (2d Cir. 1990).

### A. The Instructions Improperly Permitted Conviction Even If FSMC Was Not Deprived Of The Benefit Of Its Bargain Or A Better Deal

1.      The district court erroneously rejected defendants' proposed instruction that the jury had to acquit if FSMC "received, and was intended to receive, the full economic benefit of its bargain." (A911, A961, A1438/2352-53, A1439/2356, A1449/2424). Since there was no evidence that FSMC got less than what it paid for, and "the requested instruction was legally correct," "represent[ed] a theory of defense with basis in the record that would lead to acquittal," and was "not effectively presented elsewhere in the charge," this Court must vacate the

74

convictions.  *United States v. Prawl*, 168 F.3d 622, 626 (2d Cir. 1999); *accord United States v. Allen*, 127 F.3d 260, 265 (2d Cir. 1997).

2.     It was also reversible error to refuse to instruct that (a) "[t]he mere possibility that FSMC *might* have paid less [wa]s not enough"; (b) conviction required proof "that the alleged misrepresentation prevented FSMC from negotiating a better bargain"; and (c) the jury must acquit unless "the scheme, if it were to succeed, would result in economic harm to the victim."  (A911-12, A960-61, A1449/2424).  Without these statements (which were accurate, *see* Point IV.C *supra*), the instructions permitted convictions based on a merely hypothetical possibility of harm.

The government exploited this opening and invited conviction based on speculation about hypothetical harm.  It conceded that it could not prove "that [other] companies would have charged less than [what] COR charged on [its] projects."  (A1473/2518).  But it argued to the jury that the defendants ensured that "COR[] would get the projects, even if *some* competitor came in that would be better," and "that fact *alone* show[ed] that the misrepresentation was about potentially valuable economic information."  (A1472/2514 (emphasis added)).  The government never argued, let alone proved, that any better deal was available.  Without the requested defense language, the instructions' vague reference to

75

"potentially valuable" information virtually assured conviction based on speculation about some imaginary better deal.  (A1554/2884).

These instructional errors were plainly not harmless.  *See*, *e.g.*, *United States v. Cain*, 671 F.3d 271, 290 (2d Cir. 2012) ("incomplete instruction" warranted new trial on plain-error review); *United States v. Hastings*, 918 F.2d 369, 373 (2d Cir. 1990) ("incomplete and misleading" instruction not harmless because it "could quite possibly have left the jury believing that [an essential] finding…was not required to convict").  It is at least "possible" that the jury convicted Aiello for depriving FSMC of a purely hypothetical better deal, which was "not unlawful." *McDonnell*, 136 S. Ct. at 2375.  Accordingly, a new trial is required.  *See id.*

## B. The Instructions Were Confusing And Misleading

Even if the district court's view of right-to-control was correct and it properly rejected the defense language, the instructions were so incomplete and confusing that the jury could not have understood the law.

The instructions suggested (but did not clearly state) that "economic harm" was required.  It mentioned this term only after several abstract sentences about the "right to control," "potentially valuable economic information," and "the victim's assessment of the benefits or burdens of a transaction."   And it diluted the requirement by saying that economic harm was "not limited to monetary loss" and instead could be satisfied by showing that "the scheme, if successful, would have

76

created an economic discrepancy between what [FSMC] reasonably anticipated it would receive and what it actually received." (A1554-55/2884-85).

Defining "economic harm" in terms of "economic discrepancy" did not illuminate its meaning, especially since the jury had just been told that "economic harm [wa]s not limited to monetary loss." Fraud may not require an out-of-pocket loss, but it does require an actual or intended quantifiable financial loss. The scheme must contemplate depriving the victim of something "having monetary value"—if not a "pecuniary" sum, then at least "a better deal," whereby the victim pays a higher "price" or receives "lower-quality goods." *Finazzo*, 850 F.3d at 111; *accord Cleveland*, 531 U.S. at 20 (wire fraud requires "monetary loss"); *Regent*, 421 F.2d at 1181 (harm must "ma[ke] itself felt in the victims' pocketbook"). But the instructions never explained this to the jury.

Instead, the instructions minimized the importance of "monetary" loss (A1555/2885), and later stated that the defendants could be guilty even if they "belie[ved]…that eventually everything would work out so that [FSMC] would get a good deal" (A1555/2887-88). These instructions "seemingly contradicted" the financial-harm requirement and created a "substantial risk" of confusing the jury. *United States v. Rossomando*, 144 F.3d 197, 202 (2d Cir. 1998). The latter instruction was the *only* reference to FSMC's getting a good deal and was "unbalanced," explaining *only* that a good deal would *not preclude* a conviction.

77

*Dove*, 916 F.2d at 45-47 (instruction that "only point[ed] towards how guilt is proved" was "prejudicial"); *accord Allen*, 127 F.3d at 264-65 (vacating because charge was "imbalanced" and not "fair to both sides").

"The court should have made clear…the critical inquiry" before the jury, *Kopstein*, 759 F.3d at 181, but it did not. The instructions did not ask the jury to find any risk that FSMC was deprived of a better deal, even though this was the sole theory of harm. Instead, the court rejected defendants' proposed clarifications:

- "[T]he government must establish that the misrepresentation caused (or was intended to cause) actual harm to [FSMC] of a pecuniary (*i.e.*, monetary) nature, or that [FSMC] could have negotiated a better deal for itself if it had not been deceived."

- "This economic harm can be manifested directly—such as by increasing the price the victim paid for something—or indirectly—such as by providing the victim with something lower-quality than it otherwise would have received."

(A911-13, A959). Without instructions like these, the jury had no way of knowing what to look for.

The court compounded the confusion by refusing to specify that the "assets" FSMC had the "right to control" were development contracts. (A910, A960, A1449/2424). The instructions' "unaided reference" to the term *assets* "could not provide sufficient guidance to the jury, given the possibilit[y]" that the jury would consider the wrong assets. *Kopstein*, 759 F.3d at 181. The jury could easily have believed that preferred-developer status was one "asset" at issue, even though the

78

government conceded that preferred-developer status was not property.

(A996/116, A996/120-21); *see also Sekhar*, 570 U.S. at 737. If the jury considered only whether the defendants deprived FSMC of its right to control the award of preferred-developer status, it did not find that FSMC lost its right to control "property."

Even if some instructions were legally correct, the charge as a whole was not. "[I]ncorrect statements" in a jury charge are not necessarily "cured" just because "the charge contains the correct standard elsewhere." *Hudson v. New York City*, 271 F.3d 62, 70 (2d Cir. 2001). It was unreasonable to expect "a skillful parsing of the court's charge" from a lay jury confronted with "ambiguous and obscure" references to a convoluted legal theory. *Rossomando*, 144 F.3d at 202; *accord Kopstein*, 759 F.3d at 183 ("a jury composed of laypersons cannot be expected to [engage in] grammatical parsing, subtle exegesis, rhetorical deconstruction, and editing for harmlessness"); *Takhalov*, 827 F.3d at 1318 ("[T]he vast majority of American juries are composed exclusively of humans. And humans, unlike Vulcans, sometimes need a bit more guidance as to exactly what the court's instructions logically entail.").

"Prudence counsels vacatur when the instructions become sufficiently confused," *Kopstein*, 759 F.3d at 182, and here, it is at least "possible" that the jury "may have convicted" without finding the required harm, *McDonnell*, 136 S. Ct. at

2375. The jury "could have concluded" that FSMC's defeated expectations about the RFP process constituted economic harm, "and gone no further." *Silver*, 864 F.3d at 123 n.114.

After all, the government invited the jury to do just that. It argued at length that FSMC was deprived of "potentially valuable economic information" because the nature of the RFP process was "[s]omething [FSMC]…would want to know," and because the need for competition "was actually written in to the board resolutions" and "agreements signed by the companies." (A1472/2514-15). But this merely showed that FSMC cared about the RFP process, not that it was at risk of getting a worse deal. *See Finazzo*, 850 F.3d at 109 n.16 (misrepresentation "capable of influencing a decisionmaker" is not necessarily "capable of resulting in 'tangible harm'"). The jury almost certainly failed to get that subtle distinction, and its verdict cannot stand.

## VI. AIELLO WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE TO THE WIRE-FRAUD CHARGES

The defendants sought to introduce evidence that COR and LPCiminelli were qualified for their projects, gave FSMC exactly what it paid for, and performed high-quality work on time and for a reasonable fee. They argued that this evidence was relevant to show (1) that no harm to FSMC was implicated, since it received the benefit of its bargain, and (2) that they acted in good faith, without intent to defraud. The district court, however, disagreed and precluded the

evidence.  (Dkts.656, 657, 661, 727; A997-1009/123-74, A1127-29/796-803, A1130-31/809-11).

Per the district court, "benefit of the bargain" evidence was irrelevant (A1292/1491) unless the defendants "prove[d]" that no developer could "possibly" have given FSMC a better deal (A1002/144).  Evidence of a fair price was irrelevant unless the defendants "prove[d]…there [wa]s no way [the projects] could have been done at a lower price."  (*Id.*).  Evidence of high quality was irrelevant unless the defendants "prove[d]…that the quality couldn't have possibly been better."  (*Id.*).  The only "pearls" of evidence the court invited were those showing "no one could have done this job at a different price and this was the world's best project."  (A1002/143).

The proffered evidence was essential to the defense and clearly admissible.

## A. The Evidence Was Admissible To Show Lack Of Harm

The excluded evidence was critical proof that the alleged scheme did not "implicate tangible economic harm," *Finazzo*, 850 F.3d at 111, because FSMC "received the full economic benefit of its bargain," *Binday*, 804 F.3d at 570.  *See Starr*, 816 F.2d at 99 (no wire fraud if victim "received exactly what [it] paid for" and "there was no discrepancy between benefits 'reasonably anticipated' and actual benefits received" from defendant).

81

The ruling that the "benefit of the bargain" was irrelevant contravened this Court's precedents and precluded all defendants from arguing that the government failed to prove an essential element of wire fraud. Even worse, the district court improperly shifted the burden to the defendants, presuming that a better deal was available and requiring *them* to "prove" that FSMC got the best possible deal. However, the government "must prove every ingredient of an offense beyond a reasonable doubt, and…may not shift the burden of proof to the defendant by means of…a presumption." *Sandstrom v. Montana*, 442 U.S. 510, 524 (1979). The court's "decision rests on an error of law" and was necessarily an "abuse of discretion." *Stewart*, 907 F.3d at 686.

As an afterthought, the district court remarked that the evidence would confuse the jury and waste time. (A1007/163-64). But where evidence is "importan[t]…to the defense, whatever confusion or delay that may…result[] from its admission would have to [be] overwhelming to satisfy Rule 403's balancing test." *United States v. Harvey*, 547 F.2d 720, 723 (2d Cir. 1976); *accord United States v. Haischer*, 780 F.3d 1277, 1281-82 (9th Cir. 2015). The court made no such finding, nor could it. It deprived the jury of critical evidence on an essential element of fraud, and the error could not possibly have been harmless. *See, e.g.*, *United States v. White*, 692 F.3d 235, 251-52 (2d Cir. 2012) (exclusion of evidence was "far from harmless" where it "spoke directly to a critical element of the

Government's case"); *United States v. Forrester*, 60 F.3d 52, 64-65 (2d Cir. 1995) ("Error going 'to the heart' of a critical issue is less likely to be harmless.").

Indeed, the exclusion of this evidence violated Aiello's constitutional right to a "meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Criminal defendants have the "right to 'put before a jury evidence that might influence the determination of guilt,'" *United States v. Al Kassar*, 660 F.3d 108, 122 (2d Cir. 2011) (quoting *Taylor v. Illinois*, 484 U.S. 400, 408 (1988)), and here, the evidence was "exculpatory," *Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir. 2006), and essential to a "fundamentally fair trial," *Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) (emphasis removed). Its exclusion was an error of constitutional magnitude.

## B. The Evidence Was Admissible To Rebut Scienter

The evidence was also crucial to good faith. As defendants explained, "the fact that you did great work is some indication of what your intent was." (A1130/809). If COR "had built a structure out of cardboard and glue, there would be evidence introduced by the government about the shoddy workmanship on this project as evidence that there was an intent to defraud." (A1128/799). Excellent work and fair pricing tended to show the opposite: that defendants had no intent to deceive FSMC or deprive it of a better deal.

The district court disagreed, ruling that if defendants "did a good job" that did not *necessarily* mean "they *could not* have had an intent to defraud." (A1130/809-10 (emphasis added)). But relevance is a "very low standard." *United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008); *accord Litvak*, 808 F.3d 190 ("low threshold"). "[E]vidence need not be dispositive of an issue to be relevant." *United States v. Diaz*, 878 F.2d 608, 615 (2d Cir. 1989). In fraud cases, "circumstantial evidence of [the defendant's] state of mind" is often "extremely important to the defense." *United States v. Scully*, 877 F.3d 464, 474 (2d Cir. 2017). Because good faith "may be only inferentially proven, no events or actions which bear even remotely on its probability should be withdrawn from the jury" unless it is overwhelmingly "tangential and confusing." *Litvak*, 808 F.3d at 190. That plainly was not true here, and the district court should have admitted the evidence so that the jury could "determine whether [it]…raised a reasonable doubt about [Aiello's] guilt." *Scully*, 877 F.3d at 476; *see also United States v. Heimann*, 705 F.2d 662, 669 (2d Cir. 1983) ("realistically, when the contested issue is intent, whether or not victims lost money can be a substantial factor in a jury's determination"). Instead, the court prevented Aiello from negating the government's evidence of intent.

This Court regularly vacates convictions where, as here, key defense evidence was excluded. *E.g., Stewart*, 907 F.3d at 686-92; *Scully*, 877 F.3d at 473-

76; *Litvak*, 808 F.3d at 179-85, 188-90.  The evidence was thin (indeed, insufficient), and the excluded evidence would necessarily have raised a reasonable doubt.  Especially in light of the confusing jury instructions (*see* Point V *supra*), this Court cannot have confidence in the verdict.  It should vacate the wire-fraud convictions.

## **CONCLUSION**

Aiello's convictions should be reversed with instructions to enter a judgment of acquittal, or at least vacated and remanded for a new trial.  The Court should extend the stay of his surrender date through a decision on the merits.

Dated:      New York, New York
                 May 29, 2019

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Daniel J. O'Neill
Fabien M. Thayamballi
SHAPIRO ARATO BACH LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

*Attorneys for Defendant-Appellant*
*Steven Aiello*

85

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENT, AND
<u>TYPE STYLE REQUIREMENT</u>**

1.  The undersigned counsel of record for Defendant-Appellant Steven Aiello certifies pursuant to Federal Rules of Appellate Procedure 32(g) that the foregoing brief contains 18,895 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), according to the Word Count feature of Microsoft Word 2016, and is therefore in compliance with this Court's Order dated April 11, 2019, permitting Aiello to file a principal brief of up to 19,000 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font of Times New Roman.

Dated:    May 29, 2019

 /s/ Alexandra A.E. Shapiro   
Alexandra A.E. Shapiro
